**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| THEODORE WILLIAMS, *et al.*, | ) | |
| | ) | Case No. 1:16-cv-00266-KS-MTP |
| Plaintiffs, | ) | |
| | ) | Hon. Keith Starrett |
| v. | ) | District Judge |
| | ) | |
| GARY HARGROVE, *et al.*, | ) | Hon. Michael T. Parker |
| | ) | Magistrate Judge |
| Defendants. | ) | |
| | ) | JURY TRIAL DEMANDED |


**PLAINTIFFS' MEMORANDUM BRIEF IN RESPONSE**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .................................................................................................... 1

FACTS .................................................................................................................... 3

   I.   PLAINTIFFS' MORTUARIES AND WHITE-OWNED MORTUARIES IN
       HARRISON COUNTY ARE SIMILARLY SITUATED ................................. 3

   II.   THE FUNERAL HOME BUSINESS IN HARRISON COUNTY ................................. 4

   III.   DEFENDANTS' ROLE IN THE MORTUARY BUSINESS ........................................ 5

   IV.   DEFENDANTS DISCRIMINATE AGAINST PLAINTIFFS ON
        THE BASIS OF THEIR RACE ........................................................................ 7

        A.   The Coroner Almost Never Assigns Plaintiffs Business ........................................ 7

        B.   Plaintiffs Have Observed the Coroner Make Decisions Based on Race ................ 7

        C.   The Coroner Has Said Himself That He Makes Decisions Based On Race ........... 8

        D.   The Coroner's Race Discrimination is Evident in the Coroner Files ................... 10

        E.   Other Data Confirm the Substantial Disparity ................................................... 13

        F.   The Coroner's False Claim That He Used A Rotation System
            Is Additional Evidence of Discrimination ...................................................... 14

        G.   The Coroner's Pretextual Explanations for the Disparate Treatment
            of Plaintiffs Are Further Evidence of Discrimination ...................................... 15

           1.   The Coroner's Refrigeration Excuse Is A Pretext ....................................... 15

           2.   The Coroner's Autopsies Excuse Is A Pretext ............................................ 17

   V.   THE COUNTY AND THE BOARD HAD NOTICE OF THE
       CORONER'S DISCRIMINATION AND TOOK NO ACTION ................................. 19

   VI.   THERE ARE FACTUAL DISPUTES ABOUT THE NUMBER OF
       CASES IN WHICH THE CORONER EXERCISES AUTHORITY ............................. 20

   VII.   PLAINTIFFS' DAMAGES ........................................................................... 22

ARGUMENT ........................................................................................................ 23

   I.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD
       BE DENIED BECAUSE THEY FAIL TO CITE THE FACTUAL RECORD
       AND THEIR ARGUMENTS ARE FATALLY UNDEVELOPED ............................. 24

II.   DEFENDANTS' LENGTHY ARGUMENTS REGARDING DECEDENT AND FAMILY SELECTION OF FUNERAL HOMES HAVE NO BEARING ON SUMMARY JUDGMENT ....................................................27

III.  PLAINTIFFS ASSERT CLAIMS AGAINST THE CORONER IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES AND BOTH SHOULD PROCEED TO TRIAL ................................................................28

IV.   A JURY MUST DECIDE THE CLAIMS THAT DEFENDANTS DISCRIMINATED AGAINST PLAINTIFFS ON THE BASIS OF THEIR RACE ...........................................................................29

    A.   The Law Prohibits Race Discrimination ................................................29

    B.   Genuine Disputes of Fact About Defendants' Race Discrimination Preclude Summary Judgment ......................................31

    C.   Defendants' Specific Arguments That They Have Not Engaged In Race Discrimination Lack Merit ..................................33

        1.   Defendants' Autopsy and Refrigeration Excuses Are Pretexts ...................33

        2.   Defendants' "Statistical" Arguments Lack Merit ..........................................35

    D.   The Coroner Is Not Entitled to Qualified Immunity ..............................37

V.    A JURY MUST DECIDE THE CLAIMS UNDER § 1981 .........................................37

VI.   MTCA IMMUNITY DOES NOT APPLY ....................................................39

VII.  A JURY MUST DECIDE THE CLAIMS UNDER MISS. CODE § 41-61-63 ................................................42

VIII. A JURY MUST DECIDE THE CLAIMS OF IMPLIED BREACH OF CONTRACT AND FRAUD IN THE INDUCEMENT .........................................42

IX.   A JURY MUST DECIDE THE CONSPIRACY CLAIMS ...........................................44

CONCLUSION ............................................................................44

EXHIBIT LIST .............................................................................47

# TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6075566................................35

*Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828 (N.D. Tex. 2006) ......................................34

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)...................................................23, 25

*Alexander v. Sandoval*, 532 U.S. 275 (2001)....................................................................31

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).....................................23, 24, 27

*Boroujerdi v. City of Starkville*, 158 So. 3d 1106 (Miss. 2015) .....................................41

*Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215 (5th Cir. 2012) ..................................30

*Breck Const. Co. v. Air Liquide Am. Corp.*, 281 F.3d 1278 (5th Cir. 2001) ..................24

*Brosseau v. Haugen*, 543 U.S. 194 (2004) .......................................................................23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................23

*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000)....................................................24

*Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979) ..................................................31

*DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*,
2014 WL 3557345 ..............................................................................................................35

*Dixon ex rel. Dixon v. Alcorn Cty. Sch. Dist.*, 2012 WL 273079 (N.D. Miss. Jan. 30, 2012).......41

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)................23

*Evans v. City of Bishop*, 238 F.3d 586 (5th Cir. 2000)....................................................40

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001)..................................................40

*Fisher v. Univ. of Tex.*, 133 S. Ct. 2411 (2013) ..............................................................30

*Gallagher Bassett Services, Inc . v. Jeffcoat*, 887 So.2d 777 (Miss. 2004) ...................45

*Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404 (5th Cir. 2008) .................23

*General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375 (1982).........39

*GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649 (5th Cir. 2017)...................26

*Gratz v. Bollinger*, 539 U.S. 244 (2003).........................................................................38

## TABLE OF AUTHORITIES (cont.)

**Cases**                                                                       **Page(s)**

*Hadad v. Am. Airlines, Inc.*, 2003 WL 292170.................................................31

*Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Mississippi*, 543 F.3d 221 (5th Cir. 2008) .........38

*Hernandez v. Corpus Christi*, 820 F. Supp. 2d 781 (S.D. Tex. 2011)..........................33

*Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems*, Inc., 669 F.2d 1026 (5th Cir. 1982) ......................................................24

*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005) ...............................33

*Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012)........................................35

*Johnson v. Manpower Prof'l Servs., Inc.*, 442 F. App'x 977 (5th Cir. 2011) ..............39

*L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106 (5th Cir. 1994) .........26

*Lacy v. Morrison*, 906 So.2d 126 (Miss. 2004) .................................................44

*LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444 (5th Cir.1996) .....................................39

*Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343 (5th Cir. 2011)...................................24

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) .................................25

*Little v. Mississippi Dep't of Transp.*, 129 So. 3d 132 (Miss. 2013).............................41

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976) ...................................39

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .........................................39

*Mitchell v. Univ. of Louisiana*, 154 F. Supp. 3d 364 (M.D. La. 2015)..........................31

*Muthukumar v. Kiel*, 478 F. App'x 156 (5th Cir. 2012)..........................................31

*Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589 (5th Cir. 2007)...........................33

*Nguyen v. Louisiana State Bd. of Cosmetology*, 236 F. Supp. 3d 947 (M.D. La. 2017) ..............31

*Pearson v. Callahan*, 555 U.S. 223 (2009).....................................................38

*Perez v. Stephens*, 784 F.3d 276 (5th Cir. 2015) .........................................26

*Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334 (5th Cir. 1982) .................................31

## TABLE OF AUTHORITIES (cont.)

**Cases**  **Page(s)**

*Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S. Ct. 2097 (2000) .............................................40

*Taylor v. Johnson*, 257 F.3d 470 (5th Cir. 2001).........................................................................30

*Thoennes v. Roche Diagnostic Corp.*, 2013 WL 12124029 ........................................................31

*Tolan v. Cotton*, 134 S. Ct. 1866 (2014).....................................................................................23

*Tubacex, Inc. v. M/V Risan*, 45 F.3d 951 (5th Cir. 1995) ...........................................................25

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007).......................................25

*United States v. Am. Commercial Lines, L.L.C.,* 2017 WL 5146110 (5th Cir. Nov. 7, 2017) ......23

*United States v. Bates*, 850 F.3d 807 (5th Cir. 2017) ..................................................................26

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009).................................................................30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ..............................31

*Washington v. Davis*, 426 U.S. 229 (1976)..................................................................................30

**Statutes**  **Page(s)**

42 U.S.C. § 1981 ...................................................................................................... *passim*

MISS. CODE. ANN. § 11-46-9...........................................................................................39, 40, 43

MISS. CODE. ANN. § 41-61-53 ...............................................................................................41

MISS. CODE. ANN. § 41-61-59 .............................................................................................5, 41

MISS. CODE. ANN. § 41-61-63 ...........................................................................................41, 42

MISS. CODE. ANN. § 41-61-61(4)..............................................................................................17

**INTRODUCTION**

Plaintiffs in this case are all six African-American owned funeral homes doing business in Harrison County, Mississippi, as well as their proprietors. They bring suit against Gary Hargrove, the elected Coroner of Harrison County, for discriminating against them on the basis of their race. In particular, Coroner Hargrove for decades has instituted a policy of directing the mortuary business in his control away from Plaintiffs and toward the white-owned funeral homes in Harrison County. The County and its Board of Supervisors have ratified the Coroner's racial discrimination, without taking action to correct the problem. This discrimination against Plaintiffs, which continues to this day, has deprived them of the opportunity to compete equally in the marketplace and has harmed their businesses. The law entitles them to better treatment.

Defendants move for summary judgment. But the facts in the record are hotly contested, and there are substantial material disputes that will require a trial. Defendants ignore many of the materials facts, stress immaterial facts, and present a version of events that requires drawing every inference in their favor, an approach prohibited at this stage. Contrary to Defendants' arguments, the record evidence unquestionably would permit a reasonable jury to conclude that Defendants engaged in race discrimination: Defendants have all but completely excluded Plaintiffs from receiving mortuary business in their control; Plaintiffs repeatedly have observed the Coroner exercise his authority based on race; the Coroner has said that his decisions are influenced by race; and thousands of the Coroner's own files—produced by the Coroner himself and extensively analyzed by Plaintiffs and their experts—reveal racial discrimination.

None of Defendants' arguments has merit. A substantial portion of their brief focuses on the fact that decedents and their families routinely make decisions about what funeral home they will use following a death. No doubt this is true. But this case is not about instances in which

decedents or their families select funeral homes. It is instead about the manner in which the Coroner exercises his authority in those cases where the decedents and their families do not choose the homes, and where the Coroner controls what funeral home in Harrison County will receive mortuary business. In those cases, the record amply supports that the Coroner exercises his authority with race in mind. Though the parties dispute the number of deaths the Coroner controls, that dispute pertains only to Plaintiffs' damages—it is not a basis for judgment.

Defendants also argue that the need to refrigerate bodies and to conduct autopsies explains why the Coroner favored white-owned homes over Plaintiffs' business. But in reality, Plaintiffs had the necessary facilities and were abundantly prepared to handle any business that Defendants sent to them—they were similarly situated to the white-owned homes, and Defendants have not pointed to any record evidence suggesting otherwise. Defendants' refrigeration and autopsy excuses are nothing more than pretexts, invented only after this case was filed and contradicted by the record. Before this lawsuit, the Coroner never offered either of these excuses as a reason for directing business away from Plaintiffs' funeral homes.

Instead, in the past the Coroner stated repeatedly that his only policy for assigning business in his control was to use a rotation system, where he sent cases to each funeral home in turn. Notably, however, there is no argument in Defendants' summary judgment brief that the Coroner adhered to such a rotation system. The reason for this is that the Coroner's claimed rotation system has been contradicted by all evidence adduced during discovery. The fact that the Coroner's past explanation for how he distributed mortuary business to funeral homes in Harrison County was invented out of whole cloth is further evidence of discriminatory purpose.

None of Defendants' asserted reasons for treating Plaintiffs differently than white-owned funeral homes in Harrison County holds water. Defendants will have the opportunity to present

their view of the facts at trial. But established standards under Federal Rule of Civil Procedure 56 prevent them from arguing at this stage that their view of the facts warrants judgment as a matter of law. As explained in more detail below, the record precludes summary judgment. Plaintiffs have faced unlawful discrimination for many years. It is time for their day in Court.

## FACTS

### I. PLAINTIFFS' MORTUARIES AND WHITE-OWNED MORTUARIES IN HARRISON COUNTY ARE SIMILARLY SITUATED

Plaintiffs are Lockett-Williams Funeral Home, Richmond August Funeral Home, Hartwell & Family Funeral Home, Marshall Funeral Home, Dickey Brothers Funeral Home, and J.T. Hall Funeral Home—the six black-owned mortuaries in Harrison County—and their proprietors. Ex. 1 (Plaintiffs' Responses to Harrison County's Interrogatories), No. 2 at 2-3.[1] Plaintiffs are family businesses, run by religious and civic leaders in the community. Ex. 2 (Deposition of Eddie Hartwell) at 8:15-9:22; Ex. 3 (Deposition of Theodore Williams) at 8:23-10:9; Ex. 4 (Deposition of Ricky August) at 9:17-10:3; Ex. 5 (Deposition of Anthony Marshall) at 72:9-12. Bradford-O'Keefe and Riemann are the two white-owned homes in Harrison County.

Plaintiffs have at all times held the licenses required to provide all of the mortuary services at issue. Ex. 1, No. 26 at 22-23; Ex. 6 (Licenses). Since the Coroner's election in 1996, Plaintiffs have operated at the following locations with the following facilities:

- Lockett-Williams is in Gulfport. In addition to having facilities to prepare bodies and conduct autopsies, it has access to refrigeration and cremation facilities. Ex. 1, No. 17 at 16-18; Ex. 3 at 20:1-23:22, 59:18-75:18, 125:3-131:6; Ex. 7 (Declaration of Sonya Williams Barnes).
- Richmond-August has been in Biloxi since 2011. It has facilities to prepare bodies and conduct autopsies. In addition, it has access to refrigeration and cremation facilities. Ex. 1, No. 17 at 16-18; Ex. 4 at 31:13-32:16, 71:21-25; Ex. 8 (Deposition of Lasha August) at

---

[1] Plaintiff Theodore Williams owns Lockett-Williams; Ricky August, Lasha August, and Jonathan August own Richmond-August; Eddie Harwell owns Hartwell; Anthony Marshall and Gina Marshall own Marshall; Pamela Dickey owns Dickey Brothers; and Helen Evans owns J.T. Hall. *Id.*

23:21-36:6, 46:18-48:8, 63:10-64:3, 65:18-19, 67:14-21.

- Hartwell is in Gulfport. In addition to having facilities to prepare bodies and conduct autopsies, it has had a 12-body cooler since 2016. Prior to that time, Hartwell had access to refrigeration. In addition, Hartwell has access to cremation facilities. Ex. 1, No. 17 at 16-18; Ex. 2 at 20:9-23:31, 64:10-66:2.

- Marshall is in Biloxi. In addition to having facilities to prepare bodies and conduct autopsies, they have had a 3-person cooler and crematory at a second location since 2015. Prior to that time, the Marshalls had access to refrigeration and cremation facilities. Ex. 1, No. 17 at 16-18; Ex. 5 at 15:8-14, 26:10-37:12, 60:22-61:15, 131:15-133:1, 137:17-138:6, 142:1-7, 162:13-20; Ex. 9 (Deposition of Gina Marshall) at 17:10-19:21, 32:24-34:25, 47:20-48:1, 61:25-62:15, 76:2-3.

- Dickey is in Biloxi. In addition to having facilities to prepare bodies and conduct autopsies, it has access to refrigeration and cremation facilities. Ex. 1, No. 17 at 16-18.

- J.T. Hall is in Gulfport. In addition to having facilities to prepare bodies and conduct autopsies, it has had a five-person cooler since 1979. It also has access to cremation facilities. Ex. 1, No. 17 at 16-18; Ex. 10 (Deposition of Helen Evans) at 14:14-15:13, 19:9-21:4, 25:11-16, 78:12-79:8.

When it comes to their facilities and their ability to provide the services required, Plaintiffs are similarly situated in all respects with the two white-owned mortuaries in Harrison County. Ex. 2 at 111:8-13 ("There's nothing [the Coroner] could ask us to do that we cannot do."); Ex. 9 at 111:6-12. With the exception of arguments about refrigeration and autopsies, Defendants' brief does not suggest otherwise. *See* Memorandum In Support of Summary Judgment ("MSJ"), Doc. No. 144, at 4, 6-9, 11-13, 21-23; Ex. 11 (Deposition of Coroner Hargrove) at 379:8-14 (other than coolers, autopsies, 24-hour access, and capacity to take in bodies, there is no reason unrelated to race that the Coroner would choose a white-owned home over Plaintiffs); *id.* at 400:21-401:1 (Plaintiffs have everything necessary to perform removals for the County).

## II.     THE FUNERAL HOME BUSINESS IN HARRISON COUNTY

Plaintiffs compete in the marketplace with one another and with Bradford-O'Keefe and Riemann to provide funeral services to Harrison County. Ex. 2 at 48:24-49:12. These homes provide an array of services: they conduct removals (retrieving a decedent from the location of death), transport decedents, provide storage for bodies, supply space for autopsies, conduct

funerals, counseling, and other services, and bury and cremate bodies.[2] Ex. 10 at 78:12-79:8; Ex.

9 at 31:13-15, 34:20-25, 48:2-20, 60:23-61:5, 173:2-23, 260:14-261:8; Ex. 8 at 46:18-48:8,

102:15-21, 106:9-17; Ex. 5 at 164:13-14, 168:11-18; Ex. 3 at 59:18-75:18, 127:4-131:6.

Typically, once a decedent is taken to a particular funeral home, that home will provide

all services to that decedent and their family—*e.g.*, the home that removes a body ends up

holding the funeral and performing the burial or cremation. As a result, the funeral homes

compete to maximize the number of intakes and the profits that follow. Similarly, the business is

dependent on referrals and repeat business—providing services to one decedent often means

additional business from family and friends in the future. In turn, capital raised in profitable

years can be reinvested in facilities, advertising, and other investments that increase intake

further. Ex. 9 at 111:14-112:2, 160:17-22; Ex. 2 at 110:19-111:9, 123:24-124:10, 191:20-192:4;

Ex. 5 at 73:11-82:8, 190:3-6; Ex. 8 at 145:19-151:9, 184:3-13, 194:3-19; Ex. 10 at 69:2-12, Ex. 3

at 45:18-46:6, 154:14-23; Ex. 7 ¶¶ 16-18.

## III.  DEFENDANTS' ROLE IN THE MORTUARY BUSINESS

Defendant Hargrove has been the elected Coroner of Harrison County since 1996. Doc.

48 ¶17. He is sued in his official and individual capacities for discriminating against Plaintiffs on

the basis of their race by directing mortuary business away from Plaintiffs and to the white-

owned homes as a matter of policy. *See* Amended Complaint, Doc. No. 42.

Where a death "affects the public interest," the Coroner has the authority and is required

by law to determine the funeral home to which that decedent is taken, among other things. *See*

MISS. CODE ANN. § 41-61-59.[3] State law prohibits anyone from disturbing or disposing of a

---

[2] Harrison County does not use a morgue. It has contracted out the responsibility for performing autopsies first to a private physician and second to state employees in Jackson. Ex. 11 at 386:12-388:9.
[3] *See id.* § 41-61-59(2) (defining an expansive coroner's jurisdiction, including homicides, suicides, accidents, thermal, chemical, electrical, or radiation injuries, abortion, contagious disease,

decedent who falls within the Coroner's jurisdiction unless authorized by the Coroner. *See id.* §§ 41-61-61 & 41-61-69. Exercising this authority, the Coroner conducts death investigations and determines the cause and manner of death. Ex. 11 at 118:22-121:7. In cases he controls, the Coroner selects a funeral home to conduct a removal, decides where autopsies will take place and where bodies will be stored, and determines what homes will conduct burials and cremations of indigent individuals and individuals whose relatives are not located. Ex. 11 at 193:21-212:5, 231:24-236:9.[4] The Coroner also recommends funeral homes to families. Ex. 8 at 21:14-25.[5]

Defendants state in their brief that Plaintiffs' claims challenging the Coroner's policies *are* claims against Harrison County and its Board of Supervisors. MSJ at 20. The Board sets the Coroner's budget, approves burial or cremation of indigent individuals and individuals whose kin are not located, and authorizes payment of County funds to funeral businesses. It also receives and considers complaints about the Coroner, choosing whether to address those complaints as part of County business. Otherwise, the County allows the Coroner to operate his

---

unexpected/unexplained deaths, deaths in custody, deaths where a physician was not in attendance within the 36 hours before death, where a decedent is not claimed by a family, where the dependent's identity is not known, deaths of children, where investigation is necessary, where a person dies in a hospital within 24 hours of admission, drug overdoses, and certain stillborn deliveries); Ex. 11 at 144:16-149:25.

[4] Defendants argue throughout their brief that they must follow the wishes of family members when selecting the funeral homes. As discussed below, this lawsuit does not concern cases in which decedents pre-select or family members choose funeral homes; it concerns cases where the Coroner exercises his authority to select funeral homes. Nonetheless, it is worth clarifying that the statute that Defendants cite as constraining the Coroner's authority—Mississippi Code § 73-11-58—is found within the title and chapter that governs the licensing of individuals engaged in the funeral business. *See* MISS. CODE ANN. Title 73, ch. 11. That chapter governs what funeral homes may and may not do. It does not purport to constrain the Coroner's authority discussed already. *See* MISS. CODE ANN. Title 41, ch. 61. Mississippi courts have recognized that the Coroner's authority is not overridden by a family choice where the Coroner properly exercises his authority. *E.g.*, *Sanders v. Chamblee*, 819 So.2d 1275, 1278 (Miss. 2002). And the Coroner testified at his deposition that his authority in many instances trumps a family choice. *See* Ex. 11 at 200:22-201:2 (in cases where an investigation is required); *id.* at 231:24-236:9 (in homicide cases, suspicious cases, suicide cases, autopsy cases, and others).

[5] When the Coroner is unavailable, he uses deputies, who work directly for him. They follow his policies and have no role in policymaking for the office. Ex. 12 (Deposition of Brian Switzer) at 26:19-27:1; Ex. 13 (Deposition of Charles Wise) 33:12-23. The Deputies have never been given any written policies or training manuals. Ex. 12 at 27:21-23, 60:19-61:1; Ex. 13 at 34:25-35:5, 78:9-16.

office in the manner he sees fit. Ex. 11 at 150:1-157:17, 188:4-192:2; Ex. 14 (Coroner Response to First Interrogatories), Nos. 6 & 8, at 28-32; Ex. 15 (County Response to First Interrogatories), Nos. 5 & 7, at 23-27. Defendants receive federal funding. Ex. 11 at 155:9-157:17.

## IV. DEFENDANTS DISCRIMINATE AGAINST PLAINTIFFS ON THE BASIS OF THEIR RACE

### A. The Coroner Almost Never Assigns Plaintiffs Business

It is exceedingly rare for the Coroner to ever call Plaintiffs to perform services for Coroner cases in his control. At best, some Plaintiffs have received a handful of calls from the Coroner for removals in the years they have been in business; some of Plaintiffs' funeral homes have never been called. Ex. 2 at 92:18-93:8; Ex. 9 at 92:7-9; Ex. 3 at 53:23-54:6; Ex. 8 at 156:12-13, 183:5-9. Plaintiffs are never called by the Coroner to remove white bodies. Ex. 5 at 60:1-4, 68:12-15; *see also* Ex. 11 at 336:20-340:17. Autopsies have never been performed at most of Plaintiffs' facilities. Ex. 9 at 31:9-12; 92:7-19; Ex. 8 at 42:20-23; Ex. 5 at 129:10-130:13; Ex. 2 at 28:11-32:1, 53:8-54:4. Other assignments (transportation, burials, cremations, storage, etc.) are virtually nonexistent. Ex. 5 at 66:24-67:7, 172:23-173:8; Ex. 4 at 87:1-12, 194:8-24, 199:16-21; Ex. 8 at 61:11-62:3. While the Coroner testified he visits Riemann and Bradford O'Keefe between 200 and 1,000 times per year each, he could not say that he had visited Plaintiffs' facilities even 10 times per year. Ex. 11 at 279:14-285:1.

### B. Plaintiffs Have Observed the Coroner Make Decisions Based on Race

In their professional practice, Plaintiffs have observed Coroner Hargrove sending white bodies exclusively to white-owned funeral homes, and they have observed that he often calls white-owned funeral homes to remove black bodies as well. Ex. 16 (Plaintiffs' Supplemental Responses to Harrison County's Interrogatories) at 2; Ex. 10 at 56:13-61:2 (a Coroner case went to a white-owned home even though the homicide happened on the corner where J.T. Hall is

located); *see also* Ex. 9 at 214:24-215:25; Ex. 8 at 133:6-13; Ex. 5 at 90:1-20, 195:16-196:13; Ex. 2 at 192:17-193:9; Ex. 10 at 47:9-16; Ex. 3 at 89:24-95:18, 107:14-110:15.

In addition, Plaintiffs have observed the Coroner disobey the wishes of families in order to send decedents to white-owned funeral homes even after those decedents have expressed a preference for Plaintiffs' homes. Sonya Williams Barnes recounts the following incident:

> After Mrs. Pitman's husband was killed, Coroner Hargrove sent Riemann Funeral Home, even though Mrs. Pitman had requested Lockett Williams Mortuary. Coroner Hargrove insisted that Riemann Funeral Home take the body. Mrs. Pitman insisted that Lockett Williams Mortuary provide services. When Lockett Williams arrived at the scene, a car from Riemann Funeral Home was leaving. Coroner Hargrove was on the scene at that time. Eventually, Coroner Hargrove relented, but only after causing some trauma to the family, and after denying the family their first request.

Ex. 7 ¶ 13. When former Board member William Martin died in 2015, his family asked the Coroner to use Lockett-Williams for the removal and services, but the Coroner assigned the case to Riemann. *Id.* ¶ 14. Plaintiffs testified about numerous other examples.[6]

## C. The Coroner Has Said Himself That He Makes Decisions Based On Race

The Coroner has said himself that he makes decisions about what funeral home to select based on race. He has told Plaintiff Gina Marshall "that white bodies go to the white funeral homes, and the black bodies go to the black funeral homes," and "that a white person wouldn't want their mother laying in the back room next to a black man." Ex. 9 at 174:4-17; *see also* Ex. 16 at 5; Ex. 5 at 66:16-19; Ex. 8 at 112:23-114:1; Ex. 4 at 202:12-15.

---

[6] Ex. 5 at 56:19-57:18 (Marshall has gone numerous times to retrieve bodies from white-owned funeral homes after the Coroner sent them there against family wishes); Ex. 4 at 194:25-195:16 (a woman who had pre-designated Richmond-August as her funeral home died and was sent by the Coroner to another home, after which Richmond-August had to go retrieve her); Ex. 5 at 199:6-204:5 (Hardy Jackson wanted his wife Tonette Jackson sent to Marshall and the Coroner sent her to Bradford O'Keefe); Ex. 8 at 84:18-101:13 (a white man in a train and bus accident was killed very close to Richmond-August, and they started the removal, only to have the Coroner tell them to move the body to Bradford O'Keefe); Ex. 8 at 92:12-93:2, 95:17-21, 196:8-197:1 (in the case of Angela Mallard, the decedent pre-arranged with Richmond-August, but "the family was not on the scene at the time of passing and the decedent was sent to Bradford O'Keefe Funeral Home via the Coroner's office"); Ex. 2 at 70:15-72:2 (Shannon Jackson was sent to Riemann despite the family's wishes that Harwell take care of the body).

Following complaints by Plaintiffs, Board President Connie Rockco had a conversation with the Coroner and Board member John Johnson about the disparate treatment of Plaintiffs. Ex. 17 (Board Roster). The Coroner again admitted that race plays a part in his selection of funeral homes. Mr. Johnson reported to Mr. Hartwell that, when challenged about whether he was using a rotation system, the Coroner said "that he did not believe that white families would want black funeral directors to handle their loved ones." *See* Ex. 16 at 4; Ex. 2 at 88:10-89:25. The Coroner was asked at his deposition, "Have you ever said to any person that white bodies go to white funeral homes and black bodies go to black funeral homes?" and he responded, "That was in the [con]text of a conversation with Ms. Rockco." Ex. 11 at 349:23-350:2.[7] There is now a dispute about what occurred during this conversation.[8] This is a dispute a jury must resolve.

_____

[7] When asked to explain the conversation, the Coroner testified:

A. Ms. Rockco asked the question, how is it determined what funeral homes that people go to. I said, historically, generally speaking, whites pick white funeral homes, blacks pick black funeral homes, and she cut me off.
Q. What did she say in response to that?
A. She said, you can't say that.
Q. And why did she – did she say anything other than you can't say that?
A. I don't remember if she expounded on it. She just said, you can't say that. And I said, let me explain to you what I'm saying. She said, you just can't say that. And I said, I need to explain to you what I'm trying to tell you here. And she said, you can't say it, and I've got to start the board meeting, and got up and walked out.

* * *

Q. My question for you is, have you now testified about everything that you recall about that conversation with Connie Rockco?
A. Yes.
Q. Okay. You don't recall anything else that you said to her during that conversation?
A. I tried to explain – well, yes, I tried to explain to her that – expound on what I was saying.
Q. So I got that. But in terms of what was actually said in that conversation with Connie Rockco, do you recall anything else that was actually said during that conversation?
A. No.

Ex. 11 (Hargrove Dep) at 350:6-351:22.

[8] At her deposition, President Rockco provided accounts of two conversations with the Coroner. She testified that in a first conversation they discussed nothing about race discrimination, the Coroner told her he had control of a small number of bodies and used a rotation system, and then the conversation ended. Ex. 41 at 65:17-67:15. The Coroner's testimony just outlined does not describe that conversation. President Rockco testified that in a second conversation, the Coroner raised that Plaintiffs were

The Coroner also discussed the role of race in selecting funeral homes with Board member William Martin. At his deposition, when asked if he had talked with Mr. Martin "about, historically, black folks going to black homes and white folks going to white homes," the Coroner affirmed that he had. Ex. 11 at 353:16-354:8 ("Correct.") Moreover, the Coroner testified that could not name a single time he had selected a black-owned funeral home to remove a white body. Ex. 11 at 336:20-340:17. In his 20 years in office, he could not say he had sent more than five white bodies to black-owned homes. *Id.*

### D.     The Coroner's Race Discrimination is Evident in the Coroner Files

In this case the Court compelled Defendants to produce case files that the Coroner opens for each death in Harrison County falling in his jurisdiction (the "Coroner files"). *See* Doc. Nos. 55, 60. Defendants' produced 5,821 Coroner files, which constitute all of the Coroner files for the time period from 2012 until mid-2016. In that period, there were 10,563 deaths in Harrison County, meaning that the Coroner opened a file in roughly 55% of all deaths. On average, 2,347 deaths in Harrison County are processed by funeral homes each year,[9] and for 1,293 of those deaths the Coroner opens a Coroner file. In each of the Coroner files, the Coroner records his "Reason for Assuming Medical Examiner Jurisdiction" on a form. As discussed, the Coroner exercises jurisdiction in cases affecting the public interest, including cases involving homicide,

---

complaining of race discrimination, that the Coroner said historically black people go to black funeral homes and white people go to white funeral homes, that he could not tell people what homes to go to if they had already decided themselves, and that President Rockco responded that his explanation seemed logical. *Id.* at 72:9-75:8. President Rockco's account of this second conversation is contradicted by the Coroner's own testimony about the same conversation, in which the Coroner made clear that President Rockco would not let him explain his views and instead told him that he could not consider race in making decisions. Ex. 11 at 349:23-351:22. For his part, Mr. Johnson testified at his deposition that during this meeting he never heard any discussion about race or about white bodies going to white homes and black bodies going to black homes. Ex. 42 at 14:4-17:10, 18:6-19:14. But prior to his deposition, Mr. Johnson said that during the conversation the Coroner said it was proper for black bodies to go to black-owned funeral homes and for white bodies to go to white-owned funeral homes. Ex. 16 at 4; Ex. 2 at 88:10-89:25; Ex. 47 (Declaration of Anne Gottschalk).

[9] *See* Ex. 18-28 (exhibit 18 summarizes statistics found in exhibits 19-28) (2,225 deaths in 2012; 2,272 in 2013; 2,229 in 2014; 2,601 in 2015; and 1,236 in the first half of 2016; for a total of 10,563).

suicide, trauma, accident, disaster, violent, poisoning, unknown or suspicious, police custody, state, local/other, public health hazard, sudden/unexpected, surgical/anesthetic procedure, and unattended. Ex. 29 (Death Investigation Form with Confidential Information Redacted) (see highlighted portion); *see also* Ex. 11 at 305:25-307:13. The Coroner files contain other forms and documentary showing the Coroner's participation in cases falling within his jurisdiction.

Plaintiffs and their experts undertook an extensive analysis of all 5,821 Coroner files, coding each file based on 32 objective variables, and producing a comprehensive dataset of the Coroner files for analysis. *See* Ex. 30 (Coroner Files Dataset). Plaintiffs' experts—statistical expert Dr. Richard Campbell and economic damages expert John Gale—relied on this dataset to provide expert opinions in the case. *See* Ex. 31-36 (Declaration, Report, Supplemental Report, Rebuttal Report & CV of Dr. Campbell); Ex. 37-40 (Declaration, Report, Supplemental Report & CV of John Gale).[10] Neither Defendants nor their expert has put any evidence in the summary judgment record that undermines the accuracy of the Coroner file dataset in any way. Ex. 48 & 49 (Defendants' Responses to Interrogatories Regarding Dataset Errors) (identifying no errors).[11]

Analysis of the Coroner file dataset yields unambiguous results: In Coroner files that contain no evidence that a decedent or family selected a funeral home, Dr. Campbell showed that 96% of Coroner cases went to the white-owned homes. Ex. 33 at 16. This disparity cannot be explained by chance or any factor apart from race-based selection of funeral homes. *Id.*

Defendants' arguments about the number of cases that the Coroner controls have no effect on the disparity observed. The dataset reveals the same disparate treatment of Plaintiffs

---

[10] The process of coding the Coroner files, the expert and fact discovery conducted on the dataset (including on the accuracy of the dataset), Plaintiffs' experts' methodology and qualifications, and Defendants' expert report are discussed at length in Plaintiffs' response to Defendants' motion to exclude Plaintiff's experts. Instead of repeating that discussion, Plaintiffs incorporate it by reference here.

[11] As Dr. Campbell reports, there were exceedingly few errors in the dataset. *See* Ex. 33 at 2. As discussed in Plaintiffs' *Daubert* response, Defendants' expert did not review the Coroner files in issuing his opinions, and he therefore had no basis identify any error in Plaintiffs' dataset.

whether one assumes that the Coroner controlled 3%, 5%, 10%, roughly half, or all cases for which he created Coroner files. *Id.* at 18. Considering only indigent cases, which the Coroner undisputedly controls, of the 51 such cases between 2012 and 2016, 25 were conducted by Bradford-O'Keefe, 21 by Riemann, and 5 by Plaintiffs collectively. *Id.* at 13 (Table 8). Of the 45 white indigent decedents in that set, just one was assigned to Plaintiffs. *Id.* Considering the set of cases in which the Coroner or his deputy authorized the release of a body on a report of death investigation, the Coroner *never* sent a white decedent to Plaintiffs. *Id.* at 14 (Table 9).

Considering all Coroner files, between 2012 and 2016 approximately 75% of all death cases were sent to the white-owned funeral homes, while approximately 15% went to Plaintiffs collectively. Ex. 33 at 7 (Table 1(d)). The distribution was as follows:

| Body Released To | 2012 | 2013 | 2014 | 2015 | 2016 | TOTAL |
|---|---|---|---|---|---|---|
| Riemann | 46.38% | 46.31% | 45.14% | 45.68% | 44.28% | 45.68% |
| Bradford O'Keefe | 29.15% | 29.61% | 30.40% | 28.38% | 27.11% | 29.12% |
| Marshall | 7.57% | 7.30% | 7.90% | 7.54% | 5.72% | 7.37% |
| Lockett-Williams | 3.70% | 3.53% | 3.19% | 2.88% | 4.07% | 3.40% |
| Hartwell | 1.53% | 2.01% | 1.22% | 1.77% | 2.11% | 1.68% |
| J.T. Hall | 1.13% | 1.85% | 1.14% | 1.33% | 1.20% | 1.34% |
| Richmond-August | 1.05% | 0.72% | 1.14% | 0.89% | 1.51% | 1.13% |
| Dickey Brothers | 0.24% | 0.08% | 0.08% | 0.15% | 0.00% | 1.13% |

*Id.* When it comes to removals, the two white-owned homes conducted more than 80% of them, and Plaintiffs collectively performed just 17%. *Id.* at 10 (Table 6). Of the 4,228 white decedents for which removals were conducted, Plaintiffs collectively performed just 158 of them (3%). *Id.* The white-owned homes receive dozens of times more business than Plaintiffs.

Dr. Campbell applied statistical techniques to analyze the Coroner file dataset in greater detail. He concluded to a reasonable degree of professional certainty:

Coroner Hargrove insists that when he deals with a case where he has the authority to choose a funeral home he uses a race-blind rotation scheme. The available evidence strongly suggests that this simply can't be true, instead reflecting a distribution that is determined by race. In those cases where it seems clear that Hargrove or a member of his

staff actually has discretion almost all white cases go to one of the two white-owned funeral homes. And under very benign assumptions as to the proportion of cases where Hargrove has discretion, the observed allocation of cases simply does not conform to what one would expect under the equal allocation scene Hargrove insists he follows.

*Id.* at 19. Using chi-square analysis, Dr. Campbell concluded that the race disparity evident in the Coroner files could not have been caused by chance, and that there was a strong likelihood that race was the determining factor. *Id.* at 17-18.

In short, the Coroner files show that the Coroner's disparate distribution of mortuary business to the white-owned homes in Harrison County cannot be explained by chance or by any other reason that the Coroner has offered to explain why he has favored white-owned funeral homes over Plaintiffs. These findings are largely uncontested and preclude summary judgment.

### E. Other Data Confirm the Substantial Disparity

Mississippi state statistics reflect the same racial discrimination shown in the Coroner files. Ex. 18-28; *see also* MSJ at 13-15, 22.[12] Between 2007 and mid-2016, white-owned funeral homes in Harrison County received more than 78% of all business, while Plaintiffs collectively received less than 20%. Ex. 18. In that period, the white-owned funeral homes received 93% of the white decedents. *Id.* On average, the two white-owned homes each received 750-875 white decedents per year. The numbers for Plaintiff funeral homes are starkly different: Dickey Brothers has received a single white decedent in that entire time period; Hartwell, J.T. Hall, Lockett-Williams, and Richmond-August on average received 2-3 white decedents per year; and the Marshalls secured on average 58 per year. *Id.*[13] The Coroner testified he had no reason to dispute that the statistics are the same for the set of cases he controls. Ex. 11 at 366:10-371:10.

---

[12] The Mississippi state statistics are compiled by the state based on information provided by the County and by funeral homes about the number of deaths, by race, handled by each funeral home in each County. These statistics are used merely to corroborate the numbers seen in the Coroner files.

[13] The explanation for the Marshalls' success serving white decedents is they set significantly lower prices than competitors in the *private* market. Ex. 39 (Gale Report). The Marshalls' success is not a result of the Coroner sending them cases that he controls—he does not call them. Ex. 9 at 92:7-9.

### F. The Coroner's False Claim That He Used A Rotation System Is Additional Evidence of Discrimination

Before this suit was filed, the Coroner for years told Plaintiffs and the Board that he assigned mortuary business using a rotation system, by which he distributed business equally to funeral homes. This purported rotation system was the only policy the Coroner proclaimed he followed prior to this case. Ex. 11 at 250:1-251:4; Ex. 9 at 198:6-20; Ex. 2 at 85:3-88:14, 97:21-98:23, 179:11-21; Ex. 10 at 65:9-19; Ex. 5 at 56:19-57:1, 91:17-22, 139:22-25, 181:5-183:6; Ex. 16 at 2-6; Ex. 41 at 65:17-79:3; Ex. 42 at 18:6-19:14. The Coroner even testified here that he "used the rotation system the entire time that [he had] been coroner." Ex. 11 at 252:19-252:23.

The record amply demonstrates that there never was any rotation policy. If there had been a rotation system in place, one would not see the dramatic disparity outlined above in the number of Coroner cases sent to Plaintiffs versus white-owned homes. Not only did Dr. Campbell find that the data could not be squared with a rotation system, Ex. 33 at 15-18, but Defendants' expert, Dr. Palmer, testified that the Coroner's "statement about the rotation system" did "not seem consistent with the data," Ex. 43 (Deposition of Dr. Palmer) at 96:10-97:6.

The Coroner's own deputies, both of whom have worked for the Coroner since 2008, confirm that the Coroner's claim that he had a rotation policy is false. Deputy Charles Wise testified that in situations where the family had not selected a funeral home, where the decedent was indigent, or where a body was unclaimed, there never was any rotation system. Ex. 13 at 47:23-48:1-19, 70:2-12, 70:20-71:2, & 73:3-8. Chief Deputy Brian Switzer confirmed this was the case. Ex. 12 at 43:1-5, 57:13-23, 61:12-19. Moreover, the supposed rotation policy was never memorialized in any written document during the Coroner's tenure. Ex. 11 at 253:2-4.

When asked in interrogatories to describe "the process by which you select . . . a funeral home" and "any policy or policies, standards, guidelines, or other criteria that you use," the

Coroner did not mention a rotation system. Ex. 14 at 26-28. Moreover, the rotation system that had been the Coroner's proclaimed policy is mentioned only once in Defendants' summary judgment brief, where it is an idea inexplicably attributed to Plaintiffs. MSJ at 17 n.62.

### G. The Coroner's Pretextual Explanations for the Disparate Treatment of Plaintiffs Are Further Evidence of Discrimination

Defendants now argue that the need for refrigeration and the need to conduct autopsies at particular locations is what drove business to white-owned homes and away from Plaintiffs. MSJ at 6-9, 11-12, 21-23. These excuses for the disparate treatment of Plaintiffs were never set out as policies or raised in any way, with any person, at any time prior to this lawsuit.

### 1. The Coroner's Refrigeration Excuse Is A Pretext

Defendants' assertion that the need to refrigerate bodies caused cases in the Coroner's control to be sent to the white-owned funeral homes is contradicted by numerous facts in the record. First, not only did this justification for the disparate treatment of Plaintiffs not exist prior to this litigation, but it actually contradicts the Coroner's claim that he rotated cases among funeral homes. Second, Plaintiffs did and do have coolers and access to refrigeration, as outlined above. *See supra* at 3-5. These facts alone would permit a reasonable jury to conclude that this purported justification for treating Plaintiffs differently is a pretext. But there is more.

Third, the fact that the Coroner and his staff had absolutely no knowledge of Plaintiffs' refrigeration capacity prior to this lawsuit further supports that this excuse is a pretext. In his discovery responses in December 2016, the Coroner attested that in cases where he exercised his authority "he had to send any remains to Bradford O'Keefe or Riemann as they were the only two funeral homes with adequate refrigeration facilities to his knowledge for the complained of time[.]" Ex.14 at 27-28; *see also* Ex. 15 at 25. The answer also states "Hargrove did not find out the Marshall's had [a cooler] until he was there in July of 2016," the month this case was filed.

*Id*. at 27. The discovery response does not mention at all that J.T. Hall has refrigeration or that all of Plaintiffs had access to coolers because the Coroner did not know these facts. *Id* at 27-28. Indeed, even as late as his deposition in June 2017, the Coroner confirmed that he still did not know which Plaintiffs had cooling facilities. Ex. 11 at 57:8-58:4; 269:6-270:14; 379:23-381:7.[14]

Fourth, the Coroner never at any time communicated to anyone that refrigeration was a requirement of conducting County business, despite numerous conversations with Plaintiffs about why they were not receiving more business. Ex. 11 at 383:9-25; Ex. 2 at 27:13-24, 171:22-172:4; Ex. 5 at 26:18-25, 33:23-34:2, 139:8-15, 139:22-25, 181:21-25, 182:17-183:2, 183:4-6, 184:10-12, 189:19-22. If he had, they would have told him that they *did* have refrigeration and access to refrigeration, *see supra* at 3-5, and they could have built additional refrigeration units as necessary.[15] Moreover, the Coroner testified it was not his job to set minimum standards for funeral homes, and that he had never set such standards. Ex. 11 at 192:6-193:20. In addition, although Plaintiffs always had coolers or ready access to refrigeration, the Coroner never even asked them to store bodies, so neither he nor they ever had occasion to discuss refrigeration capabilities. Ex. 2 at 196:9-19; Ex. 8 at 61:11-62:3; Ex. 4 at 217:22-218:6; 219:4-12. As Plaintiff Gina Marshall put it: "I've gone to the coroner, and I've said, what do I need to do in order to get business from the County? And in 15 years, he has not told me anything that I'm deficient in, anything that I don't have or anything that I need to get." Ex. 9 at 112:3-11.

Fifth, refrigeration is not necessary to perform a removal (the act of actually picking up a body in a vehicle). Nor is it necessary to perform a range of other services that fall within the

---

[14] The Coroner and his staff never inspected black-owned mortuaries to find out their capacity to refrigerate bodies or even inquired about refrigeration facilities. Ex. 13 at 49:19-51:1. The Coroner keeps no record of the capabilities of each home. Ex. 12 at 45:1. His long-time assistant, Joy Yates, confirmed she is unaware of any documentation concerning the refrigeration at funeral homes. Ex. 44 (Deposition of Ms. Yates) at 46:13-48:2; *see also* Ex. 12 at 47:4-6 (Deputy Switzer testified the Coroner does not "have any kind of files or documentation about who has a cooler or who doesn't have a cooler.").

[15] Ex. 9 at 64:11-16; 196:12-16; Ex. 8 at 24:22-25:3; Ex. 4 at 38:8-19.

Coroner's jurisdiction (such as embalming, burials, etc.). Ex. 9 at 22:11-23:2; 25:18-25; 316:5-317:9; Ex. 5 at 13:10-13; Ex. 4 at 68:2-20. Because refrigeration is not necessary in all cases, it cannot explain the Coroner's preferential treatment of white-owned funeral homes.

### 2. The Coroner's Autopsies Excuse Is A Pretext

Defendants also now assert that autopsies had to be conducted at white-owned funeral homes, which caused the Coroner to direct Coroner cases away from Plaintiffs. Again, the record would permit a reasonable jury to conclude that this excuse is a pretext as well.

There is no dispute that autopsies can be conducted at all Plaintiff facilities. Ex. 8 at 46:18-21; Ex. 9 at 173:2-23; Ex. 5 at 131:15-142:7; Ex. 3 at 59:18-63:3, 128:23-131:6. Plaintiffs' facilities are open day and night and can facilitate autopsies at any time. Ex. 9 at 34:20-25; Ex. 5 at 137:17-138:6; Ex. 8 at 47:15-48:8; Ex. 10 at 78:12-79:8; Ex. 3 at 63:12-75:18, 127:4-128:22. To the extent refrigeration is necessary before an autopsy, the disputed facts about refrigeration are addressed above. Despite having all necessary facilities, autopsies have never been performed at most of Plaintiffs' homes. Ex. 9 at 31:9-12; 92:7-19; Ex. 8 at 42:20-23; Ex. 5 at 129:10-130:13; Ex. 2 at 28:11-32:1, 53:8-54:4.

Defendants contend that prior to the 2015 death of Dr. Paul McGarry, a forensic pathologist who worked as a contractor to the County performing autopsies, they had no authority to decide where autopsies were performed, and that Dr. McGarry decided. The record contradicts that position. The Coroner is the official authorized by law to make determinations about where autopsies occur. *See* Miss. Code § 41-61-61(4); Ex. 11 at 198:13-24, 301:6-303:7. The Coroner told Ms. Barnes that he "chooses where autopsies are going to be done." Ex. 7 ¶ 10. Dr. McGarry performed autopsies as a contractor to Defendants. Ex. 11 at 390:2-397:4. There was no written contract, but there was an oral agreement with the County. *Id.* The Board

authorized Dr. McGarry's payments after the Coroner signed off on his autopsy invoices. *Id.*

Additional evidence in the record also supports that Defendants and not Dr. McGarry had the authority to decide where autopsies were performed. For example, Dr. McGarry once conducted autopsies at both J.T. Hall and Lockett-Williams. *See* Ex. 10 at 49:6-11; Ex. 3 at 25:11-27:3. If Dr. McGarry truly had a preference for particular facilities, this would not have happened. Moreover, when asked whether he had ever asked Dr. McGarry to rotate autopsies among the funeral homes, the Coroner responded that he had not. Ex. 11 at 395:8-16. The Coroner testified he never told Dr. McGarry that he could use Plaintiffs' facilities. *Id.* at 396:2-7.

Again, the Coroner never communicated anything to Plaintiffs prior to the filing of this lawsuit about the need to conduct autopsies at the white-owned homes. Ex. 9 at 112:3-11; Ex. 5 at 130:17-131:14. At his deposition, the Coroner testified that this was an unwritten policy of his office. Ex. 11 at 209:5-212:5. But when asked to explain the policies that governed his selection of funeral homes during discovery, Coroner Hargrove's sworn interrogatory response makes no mention of any need to perform autopsies at specific facilities. Ex.14 at 26-28.

Finally, the statistical evidence in the case again shows that the need to conduct autopsies at white-owned homes is a pretext. Even removing every case in which an autopsy was authorized from the dataset, the statistical evidence of race discrimination discussed above is just as strong. If the need to conduct autopsies in a particular place caused Defendants to favor white-owned homes in autopsy cases, and that disparity in turn was responsible for skewing the data to make it appear as if Plaintiffs were being discriminated against, then one would expect that analyzing the Coroner file dataset with all autopsy cases removed would show equal treatment of funeral homes. It does not. Dr. Campbell concluded that with autopsies removed, the dataset showed the same disparity as with the autopsy cases included. The autopsy excuse statistically

cannot explain the disparity observed in the Coroner files. Ex. 33 at 14-16.

## V. THE COUNTY AND THE BOARD HAD NOTICE OF THE CORONER'S DISCRIMINATION AND TOOK NO ACTION

Plaintiffs and their employees brought the Coroner's discrimination to the attention of the Board of Supervisors. As discussed, this was the impetus behind President Rockco's decision to ask the Coroner about the obvious disparate treatment of Plaintiffs relative to the two white-owned homes. *See supra* at 8-10. Additional notice to the County and Board included: (1) Plaintiff Dickey spoke with President Rockco and asked her to look into the Coroner's race discrimination, Ex. 16 at 2; (2) Ms. Barnes spoke with Board member Mr. Martin about the Coroner's discrimination, telling him that the Coroner sent white bodies to white funeral homes and black bodies to black funeral homes. Ex. 16 at 2. Ms. Barnes encouraged Mr. Martin to raise the issue with the Board, *Id.*; (3) Plaintiff Hartwell also spoke with Mr. Martin about the Coroner's discrimination, and Mr. Martin set up a meeting with Mr. Hartwell and the Coroner, during which the three discussed the issue and the Coroner claimed to use a rotation system, Ex. 16 at 4; Ex. 2 at 86:4-21; (4) Plaintiff Hartwell also spoke with Board member John Johnson about the Coroner's race discrimination, and Mr. Johnson discussed the issue with President Rockco and the Coroner, Ex. 16 at 4; (5) Plaintiff Ricky August spoke with Mr. Johnson to express concerns about unfair treatment, Ex. 4 at 136:19-137:14; (6) Plaintiff Williams spoke with Mr. Martin about unfair treatment, and he promised to look into it, Ex. 3 at 123:7-124:1.

In addition, the Board had notice of the Coroner's race discrimination because they authorized payments for funeral business that he controlled. *See supra* at 5-7. The County's records show that 98% of County payments from 1996 to mid-2016 went to white-owned homes. Ex. 51 (the County only started paying Plaintiffs at all after this suit was filed). The Board was aware of this—President Rockco testified she raised the issue of discrimination with the Coroner

because of this disparity in County payment records. *See* Ex. 41 at 75:17-81:8 (Q. "[W]hy did you bring up race in that conversation with Mr. Hargrove? A. Because they had more – because of what the figures reflected."); *see also* Ex. 16 at 3.

Despite notice of the Coroner's race discrimination, the County and Board took no action to correct the problem. Board members told Plaintiffs that they could not do anything about the problem or that there was no problem at all. Ex. 16 at 2; Ex. 4 at 136:19-137:14. Mr. Martin told Ms. Barnes that the Board would vote to address the problem. Ex. 16 at 2. The issue was never formally presented to the Board for consideration. Ex. 41 at 83:13-84:3. In fact, after the meeting between Mr. Hartwell, Mr. Martin, and the Coroner discussed above, Mr. Martin encouraged the Plaintiffs to file a lawsuit. Ex. 2 at 85:21-87:2, 103:15-104:20; Ex. 16 at 4.

Defendants have never changed their policies governing the Coroner's assignment of mortuary business at any time. Ex. 14, Nos. 6 & 8, at 28-30, 32; Ex. 15, Nos. 5 & 7, at 23-25, 26-27; Ex. 11 at 23:10-15 (policies the same for the past four coroners). Likewise, there has been no change in the policies of the Coroner's office since this case was filed. Ex. 11 at 33:5-8 (no conversation with the Board about policies since case was filed); *id.* at 407:22-408:4 (Coroner has not considered a change in policy since the lawsuit was filed); Ex. 12 at 12-13, 127:19-128:1; Ex. 13 at 82:6-83:16. As a result, the Coroner's policy of directing business away from Plaintiffs continues to this day. Ex. 9 at 286:10-287:23; Ex. 2 at 196:9-19; Ex. 8 at 156:22-157:2.

VI.     **THERE ARE FACTUAL DISPUTES ABOUT THE NUMBER OF CASES IN WHICH THE CORONER EXERCISES AUTHORITY**

There are disputes of fact about the number of cases per year in which the Coroner exercises his authority to designate a funeral home. Defendants argue that in many cases the decedent or family designates a funeral home, and they assert that the Coroner testified that he exercises his authority in just one half of one percent of all cases. MSJ at 11. This factual dispute

is immaterial at summary judgment—it is relevant only to question of Plaintiffs' damages, not to the liability of Defendants. *See supra* at 11-12 and *infra* at 27-28.

Regardless, Defendants' assertion that the Coroner exercises authority in just 0.5% of cases is contradicted by the record and by the Coroner's own testimony. As discussed, the Coroner opens file in 55% of deaths in Harrison County each year—there are 2,347 deaths in the County per year on average, for which the Coroner opens on average 1,293 Coroner files. *See supra* at 10-13. In each Coroner file, the Coroner records his reason for assuming jurisdiction. *Id.* For the remainder of deaths in Harrison County, the Coroner does not open a file, and he does not open a file because the decedent or family has made a choice of a funeral home and the Coroner is not involved. There is no dispute that this lawsuit does not concern those cases.

But there is a dispute about the number of Coroner files that represent cases in which the Coroner exercised his authority. Plaintiffs contend that each of the 5,821 Coroner files produced for the time period from 2012 to mid-2016 represents a case in which the Coroner exercised his authority because in each he stated a reason for assuming jurisdiction. *See* Ex. 30, Column 13. But even giving Defendants the benefit of the every doubt (which is not appropriate at summary judgment), the Coroner file dataset demonstrates that the Coroner exercised his authority in far more than the claimed 0.5% of cases. For example, of the total 5,821 Coroner files, *at least* 2,859 contain no document referencing any family or decedent being involved in the choice of a funeral home. Ex. 45 (Coroner File Dataset, No Indication of Family Choice Subset). Accordingly, the Coroner exercises his authority in at minimum 635 cases per year, when inferences are drawn in Defendants' favor.[16]

---

[16] Defendants will argue that this number should be reduced further because, piling inference on inference, they contend that all individuals who die in hospice, nursing homes, or hospitals select funeral homes ahead of time and fall outside of the Coroner's control. MSJ at 9-11. But in these 2,859 Coroner files, there is no documentation demonstrating that a decedent or family made the choice of a funeral

Exercising authority in 635 of the 1,293 deaths for which a Coroner file is opened (50%) is two orders of magnitude greater than the 0.5% of cases Defendants now claim that the Coroner controls. Defendants' percentage would mean that the Coroner exercised his authority in just six (6) deaths occurring in Harrison County each year. That figure is not only facially implausible, but it is also inconsistent with the Coroner's testimony at his deposition. Defendants cite to page 255 of the Coroner's deposition for the 0.5% figure, but in that section of his testimony the Coroner is discussing the proportion of cases in which he is typically able to quickly locate a family to determine what funeral home a decedent should go to—that figure is not the percentage of cases the Coroner says he controls. Ex. 11 at 255:8-24. The number of cases in which the Coroner (versus decedents and families) chose a funeral home is disputed.

## VII.    PLAINTIFFS' DAMAGES

The Coroner's racial discrimination and the County and Board's ratification of that discrimination have deprived Plaintiffs of an equal opportunity to compete in the market. Plaintiffs have lost revenue as a result. The discrimination has persisted for years and continues to this day. Though damages are ultimately an issue for the jury to decide, the conservative model submitted by Plaintiffs' economic expert, John Gale, demonstrates that Plaintiffs collectively have lost millions of dollars in profits. *See* Ex. 39 at 15-23.

---

home or that the Coroner had knowledge of a funeral home preference, even in cases arising from hospice, nursing homes, and hospitals. *See* Ex. 45. Moreover, in at least 287 of the Coroner files that concern decedents removed from hospice, nursing homes, or hospitals, the *sole* evidence in the file showing who selected a funeral home is a release of body form signed by the Coroner. *See* Ex. 46 (Coroner File Dataset, Hospitals, Nursing Homes, Hospice, Sole Evidence of Coroner Selection). Even if the Court gave Defendants the benefit of the doubt on this point as well, and it removed those cases (96 hospice cases, 448 nursing home, and 81 hospital), the Coroner still would have made the choice of funeral home in at minimum 2,234 cases, or on average 496 cases per year. Regardless, Plaintiffs will show at trial that the number is larger, and Defendants are not entitled to inferences at this stage.

**ARGUMENT**

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only if the Court, viewing the record as a whole and in the light most favorable to the nonmoving party—here Plaintiffs—determines there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *United States v. Am. Commercial Lines, L.L.C.,* 2017 WL 5146110, at *2 (5th Cir. Nov. 7, 2017). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008). The burden is on Defendants to show that there is no genuine dispute of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970) ("[T]he party moving for  summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required.").

The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Supreme Court has recently reemphasized the "importance of drawing inferences in favor of the nonmovant" in civil rights cases. *Tolan v. Cotton*, 134 S. Ct. 1866, 1866 (2014); s*ee also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Plaintiffs' "version of any disputed issue of fact thus is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

When the evidence is susceptible to different conclusions or different inferences by the

trier of fact, summary judgment is inappropriate. *Breck Const. Co. v. Air Liquide Am. Corp.*, 281

F.3d 1278 (5th Cir. 2001) (citing *Chen v. City of Houston*, 206 F.3d 502, 506 (5th Cir. 2000)).

Summary judgment is likewise "inappropriate even where the parties agree on the basic facts,

but disagree about the factual inferences that should be drawn from those facts." *Id.* (citing

*Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems*, Inc., 669 F.2d 1026,

1031 (5th Cir. 1982)). In short, at this stage, the Court asks "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

In a case like this one, where virtually every material fact is hotly disputed, a jury must

decide where the truth lies. *Lewis v. Ascension Par. Sch. Bd.,* 662 F.3d 343, 352 (5th Cir. 2011)

(reversing grant of summary judgment on an equal protection claim). Defendants' motion is

focused on largely immaterial facts; they omit discussion of important, material facts in the

record; and to the extent they do discuss material facts, their version of events depends on

viewing the record and drawing all inferences exclusively in their favor, an approach that is not

permissible at this stage. This Court should deny Defendants' motions.[17]

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THEY FAIL TO CITE THE FACTUAL RECORD AND THEIR ARGUMENTS ARE FATALLY UNDEVELOPED

Before turning to particular arguments, it is important to note a number of issues that

fatally undermine Defendants' motion for summary judgment. First, the motion is replete with

key factual contentions that are entirely unsupported by citations to the record. To be clear, the

issue is not only that Defendants have cited to materials in the record that fail to support the

---

[17] Though Plaintiffs agree they cannot proceed on a claim of negligent infliction of emotional distress, *see* MSJ at 24, Plaintiffs have not raised such a claim, *see* Doc. No. 42 at 26-27. Separately, Plaintiffs agree not to proceed on a claim of Negligent or Willful and Wanton Conduct, so far as that is understood as a standalone, substantive claim. Plaintiffs, of course, reserve the right to seek punitive damages before the jury. *See id.* at 30.

factual points they discuss (which they have done as well), it is that Defendants have in many instances cited to nothing in the record at all.

A party moving for summary judgment bears the burden, at minimum, of pointing to support in the record for what they claim are the undisputed facts. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "Conclusory statements are not competent evidence" at summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). When a party fails to cite competent evidence, that party fails to meet their initial summary judgment burden and "the motion must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*); *see also Adickes*, 398 U.S. at 161.

Defendants devote an entire section to "refrigeration," but cite absolutely no facts in the record for the propositions on which their argument depends—namely, that the only funeral homes with adequate refrigeration were the white-owned funeral homes and that Plaintiffs did not receive bodies from the Coroner because of a lack of refrigeration. *See* MSJ at 8. Likewise, Defendants cite no record support for their contested assertion that "Riemann's in Gulfport was the only funeral home in Harrison County with the proper facilities for the performance of an autopsy." *Id.* at 12. Defendants' entire discussion of indigent burials contains no citation to the record. *Id.* at 13. Their contention that persons who die in nursing homes are never assigned to funeral homes by the Coroner is similarly unsupported. *Id.* at 11 (stating without citation that the "scenario" for nursing homes is the same as in hospice situations). Plaintiffs should not have to respond to factual assertions not based in the record. Because these factual assertions are key to Defendants' arguments, their argument for summary judgment fails on that basis alone.

Second, most of Defendants' legal arguments are fatally undeveloped. A party moving for summary judgment bears an initial burden to advance an argument sufficient to shift the

burden to the plaintiff. *Duffie*, 600 F.3d at 371. The Fifth Circuit has warned repeatedly that undeveloped or cursory arguments are forfeited. *See*, *e.g.*, *GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 667 (5th Cir. 2017) (because a party did "not develop this argument beyond a conclusory sentence," the Court did "not consider it"); *United States v. Bates*, 850 F.3d 807, 811 n.2 (5th Cir. 2017) ("Because [the party] has failed to adequately develop this . . . argument, it is waived."); *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994) (argument forfeited because party's briefs provided no citation to authority).

The vast majority of Defendants' legal arguments are developed in a few sentences or less. Their argument regarding Plaintiffs' claims under § 1981 is limited to two sentences. MSJ at 23. Arguments for judgment on Plaintiffs' Title VI and the Mississippi Constitution claims are each a single sentence, consisting of a bald assertion that Plaintiffs cannot show their rights have been violated. *Id.* The Coroner argues he is entitled to qualified immunity in three sentences. *Id.* His argument for immunity under the Mississippi Tort Claims Act is that length as well. *Id.* Defendants' arguments concerning implied breach of contract, fraudulent inducement, and Plaintiffs' claims of civil conspiracy are similarly cursory. *Id.* at 24-25. Each of these arguments is insufficient to shift the summary judgment burden. *Tubacex*, 45 F.3d at 954.

Lastly, Defendants have not addressed at all Plaintiffs' claims of breach of contract and intentional infliction of emotional distress (Counts VII & X). MSJ at 20-25. A party who fails to address a claim at summary judgment forfeits their challenge to that claim. *See*, *e.g.*, *Perez v. Stephens*, 784 F.3d 276, 282 (5th Cir. 2015) ("[I]t is well-established that the failure to timely raise an issue forfeits that argument."). Defendants also concede that Plaintiffs' *respondeat superior* claim is proper (Count XIII). MSJ 5 n.7. Because Defendants have not raised any challenge at all to these claims, Plaintiffs do not address them in this response.

## II. DEFENDANTS' LENGTHY ARGUMENTS REGARDING DECEDENT AND FAMILY SELECTION OF FUNERAL HOMES HAVE NO BEARING ON SUMMARY JUDGMENT

It is also important at the outset to dispose of Defendants' lengthy discussion of cases in which a decedent pre-designates a funeral home or a family chooses one. Indeed, at least ten pages of Defendants' briefing are devoted to this topic. MSJ at 2-4, 5-6, 9-11, 15, 21-23. Put simply, this lawsuit is not at all concerned with death cases that the Coroner does not control or influence. Instead, this case, and the summary judgment dispute, is about the way in which the Coroner exercises his authority in cases that *do* fall within his control. Accordingly, Defendants' argument that the Coroner cannot be liable for cases he had nothing to do with is both correct and irrelevant to this Court's resolution of summary judgment. *Anderson*, 477 U.S. at 248 ("[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

Plaintiffs contend the Coroner discriminated against them in the cases that he controlled. To be sure, there is a dispute of fact for trial about the total number of cases the Coroner controlled. *See supra* at 20-22 (explaining that the evidence shows that the Coroner controls between 635 and 1,293 cases per year, depending on whose version of facts is believed). But that dispute about numbers goes to damages—the more cases that the Coroner controls, the more harm Plaintiffs suffer when the Coroner directs those cases away from them and to the white-owned funeral homes. That dispute has nothing to do with whether summary judgment is appropriate on the question of whether the Coroner discriminated against Plaintiffs on the basis of their race.[18] Whatever the number of cases in his control, the Coroner's discrimination is

---

[18] Consider Defendants' discussion of the disposition of cases that arise when individuals die in hospice care. MSJ at 9-11. Defendants contend that none of these cases are controlled by the Coroner. *Id.*

unequivocally supported by the record. *See supra* at 10-13. That, and not the extent of Plaintiffs' damages, is the issue before the Court.

### III. PLAINTIFFS ASSERT CLAIMS AGAINST THE CORONER IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES AND BOTH SHOULD PROCEED TO TRIAL

Defendants argue that the claims against the Coroner in his official capacity should be dismissed based on the uncontroversial principle that an "official capacity suit is . . . to be treated as a suit against the entity." MSJ at 16 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1978)). Defendants contend the Harrison County and its Board of Supervisors is the applicable government entity for official-capacity claims, but they cite nothing in support of this assertion. Nonetheless, to the extent Defendants jointly maintain that the County and Board are the government entity responsible for any claims against the Coroner in his official capacity and agree to be bound by that representation, then the County and the Board can be substituted as the proper Defendant on Plaintiffs' official-capacity claims. However, given the absence of any development of this issue in Defendants' motion, to the extent the issue is actually contested, Defendants have failed to meet their summary-judgment burden.

As to claims against the Coroner in his individual capacity, Defendants fail to come close to showing that undisputed facts warrant summary judgment. First, Defendants claim that "it is clear that there are only a few cases" where the Coroner has authority to potentially discriminate

---

There is a dispute of fact on that question. Construing the evidence in the light most favorable to Plaintiffs, there is evidence that the Coroner control some cases that come from hospice. For example, for at least 96 Coroner files concerning cases coming from hospice, the case file includes written documentation, signed by the coroner, directing the body to be released to a particular home. *See* Ex. 46. Moreover, in the same deposition Defendants cite, *see* MSJ at 9-11, Beth Seymour estimates that between 10% and 20% of people in hospice have not designated a funeral home, that their facility does not help make that selection, and that she has no idea how often the Coroner responds to a death at their facility. Ex. 50 (Deposition of Beth Seymour) at 4:9-5:3, 8:17-9:2. Regardless, the dispute about the extent to which the Coroner controls this particular subset of cases is an issue that either increases or decreases the total number of cases in the Coroner's control. Answering that question does not tell us whether the Coroner discriminated against Plaintiffs in the cases that he did control.

against Plaintiffs. MSJ at 20-21. As discussed above, that is a disputed fact. But, again, the

number of cases that the Coroner controls affects damages, not resolution the pending motion.

Second, Defendants claim that among the "limited and conditional instances" where the

Coroner exercised his authority, "there has been no evidence presented that Hargrove acted

wrongfully." MSJ at 21. As discussed further below, the evidence in the record proves this

assertion is baseless. There is ample evidence of Defendants' discrimination, and certainly more

than enough to permit a jury to conclude that Defendants violated Plaintiffs' rights.

## IV.     A JURY MUST DECIDE THE CLAIMS THAT DEFENDANTS DISCRIMINATED AGAINST PLAINTIFFS ON THE BASIS OF THEIR RACE

Defendants argue that the undisputed facts demonstrate that they did not engage in race

discrimination, warranting summary judgment on Plaintiffs' equal protection claims under

§ 1983. MSJ at 20-23. But Defendants ignore the summary judgment standard. They are required

at this stage to construe disputed facts for Plaintiffs and to draw inferences in their favor. In

addition, Defendants must produce evidence—not just self-serving assertions—showing that

there is no dispute that they are entitled to relief. They have failed to do so. Plaintiffs' claims that

Defendants engaged in race discrimination are supported by the record.[19]

### A.     The Law Prohibits Race Discrimination

State actors are prohibited from denying "any person within [their] jurisdiction the equal

protection of laws." U.S. CONST. AMD. XIV § 1. A central purpose of the Equal Protection

Clause "is to prevent the States from purposely discriminating between individuals on the basis

of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993); *see also Bowlby v. City of Aberdeen*, 681 F.3d

---

[19] To the extent that the Court concludes that Defendants have not forfeited summary judgment challenges to Plaintiffs' claims under Title VI and the Mississippi Constitution, *see supra* at 24-26, Defendants' arguments on those claims are, at best, based on the same assertion that the undisputed facts demonstrate that they did not engage in race discrimination. MSJ at 23. As a result, Defendants' arguments for summary judgment on the Title VI and Mississippi Constitution claims fail for the same reasons as their challenges to Plaintiffs' equal protection claims.

215, 227 (5th Cir. 2012). Indeed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2418 (2013).

To state a claim of racial discrimination under § 1983 based on a violation of the Equal Protection Clause, Plaintiffs need only illustrate that (1) they received treatment different from that received by similarly situated individuals and (2) the unequal treatment stemmed from a discriminatory intent or purpose. *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). Discriminatory intent or purpose "implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." *Id.* "Racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

In addition, while proof of racially discriminatory purpose is necessary, "disproportionate impact is not irrelevant." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Instead, the "general rule . . . is that disparate impact is relevant to, and may permit an inference of, purposeful discrimination." *Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 375 (5th Cir. 1982). The Supreme Court has explained: "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979) ("[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose" because they are "one of the several kinds of proofs from which an inference of segregative intent may be properly drawn"). In a discrimination case, circumstantial

evidence or disparate impact is a basis to deny summary judgment, as numerous courts have recognized. *See Nguyen v. Louisiana State Bd. of Cosmetology*, 236 F. Supp. 3d 947, 954 (M.D. La. 2017); *Mitchell v. Univ. of Louisiana*, 154 F. Supp. 3d 364, 386 (M.D. La. 2015); *Thoennes v. Roche Diagnostic Corp.*, 2013 WL 12124029, at *9 (N.D. Tex. Jan. 17, 2013); *Hadad v. Am. Airlines, Inc.*, 2003 WL 292170, at *4 (N.D. Tex. Feb. 7, 2003).

The same substantive legal principles govern Plaintiffs' claims under the Mississippi Constitution and Title VI, with the only exception being that Title VI applies only to government entities and not to individuals.[20] Accordingly, Plaintiffs' claims based on § 1983, Title VI, and the Mississippi Constitution rise and fall together.

### B. Genuine Disputes of Fact About Defendants' Race Discrimination Preclude Summary Judgment

The summary judgment record discussed above is replete with evidence that would permit a reasonable factfinder to find in favor of Plaintiffs on their claim that Defendants engaged in race discrimination. In summary, the Coroner almost never selects Plaintiffs to perform business that he assigns, *see supra* at 7; he sends white bodies to white-owned funeral homes and usually calls white-owned funeral homes to remove black bodies as well, *see supra* at 7-8; the Coroner disobeys the wishes of families who have selected Plaintiffs and instead sends those families' decedents to the white-owned funeral homes, *see id.*; the Coroner has said himself, to Plaintiffs and to Board members, that white bodies go to white funeral homes and black bodies go to black funeral homes, and that white people would not want their family

---

[20] Under Title VI of the Civil Rights Act of 1964, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001) (setting out identical standards); *Muthukumar v. Kiel*, 478 F. App'x 156, 159 (5th Cir. 2012) ("Title VI permits suits only against public or private entities receiving funds and not against individuals."). As set out above, Defendants receive federal assistance.

members' remains handled by black people, *see supra* at 8-10; he cannot recall a single instance where he selected a black-owned funeral home to remove a white decedent, *see supra* at 10; the Coroner files unambiguously demonstrate the Coroner's discrimination against Plaintiffs' homes, *see supra* at 10-13; extensive statistical analysis of those files allows no conclusion other than that the disparity seen in the files is the result of race discrimination, *see id.*; and other data kept by Mississippi confirms the disparate treatment Plaintiffs have suffered as a result of Defendants' policies, *see supra* at 13. This is strong evidence in support of Plaintiffs' claims.

In addition, the Corner stated repeatedly prior to this lawsuit that the sole policy guiding his assignment of cases was a rotation system. All evidence demonstrates that this claimed policy never existed. Now, in their summary judgment brief, Defendants proceed as if they had never embraced such a policy, *see* MSJ at 17 n.62, despite that the record makes plain that they told Plaintiffs on numerous occasions that the Coroner used a rotation system. *See supra* at 14-15. The fact that the Coroner had a false explanation for how assigned business, which Defendants abandoned during this lawsuit, further demonstrates that there are disputes a jury must resolve.

Finally, the Board had explicit notice of the Coroner's racially discriminatory policies— from Plaintiffs and from the County's payment records. The Board President and other Board members discussed the issue with the Coroner repeatedly. Nonetheless, the Board took no action to correct the problem, and instead continued to ratify the Coroner's actions. Defendants have not altered their policies at any time, even after this lawsuit was filed. The discriminatory and disparate treatment continues to this day. *See supra* at 19-20.

These facts would likely entitle Plaintiffs to summary judgment on liability. There is nothing in Defendants' brief that contradicts this evidence of discrimination. This Court should reject their argument that undisputed facts show they did not discriminated on the basis of race.

### C. Defendants' Specific Arguments That They Have Not Engaged In Race Discrimination Lack Merit

Defendants respond by raising the following few arguments: that families choose funeral homes; that the need for refrigeration caused the disparate treatment of Plaintiffs; that autopsies could only be conducted at white-owned homes; and that certain Mississippi death statistics demonstrate that they did not engage in race discrimination. *See* MSJ at 21-22. Defendants' irrelevant argument about cases in which a decedent or family selects a funeral home has been addressed already. None of the remaining arguments has merit.

### 1. Defendants' Autopsy and Refrigeration Excuses Are Pretexts

As set out above, ample factual disputes preclude summary judgment on Defendants' claims that refrigeration and autopsies explain the disparate treatment of Plaintiffs. The record supports that these are obvious pretexts. Prior to the filing of this lawsuit, the Coroner professed that his claimed rotation system was the only policy guiding his selection of funeral homes for cases in his control; he never mentioned a need for refrigeration or a policy of conducting autopsies in particular places; and these new excuses, which actually contradict the earlier claimed rotation policy, only arose after this lawsuit was filed. *See supra* at 14-15; *see also Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005).

Moreover, Plaintiffs today and in the past have had the facilities to conduct autopsies, and they have had coolers or ready access to refrigeration. There is no dispute in the factual record that they were similarly situated to the white-owned homes in this respect. *See supra* at 3-4. A claimed difference between facilities that does not actually exist does not explain disparate treatment. *See Hernandez v. Corpus Christi*, 820 F. Supp. 2d 781, 800 (S.D. Tex. 2011); *Acker v.*

*Deboer, Inc.*, 429 F. Supp. 2d 828, 842 (N.D. Tex. 2006).

In addition, though Defendants now claim that the need for refrigeration drove their decision making in the past, they did not know even during this lawsuit which of Plaintiffs' facilities had coolers or access to coolers. Before this lawsuit, they never took steps to find out. *See supra* at 15-17. If Defendants did not know which funeral homes in Harrison County had refrigeration in 2017, then refrigeration cannot explain the Coroner's preference for white-owned homes prior to this lawsuit being filed. Moreover, though Defendants presumably now know— because of this litigation—that Plaintiffs maintain and have access to refrigeration, there has been no change in Defendants' policies or assignment of business to Plaintiffs.

With respect to Defendants' claim that Dr. McGarry chose white-owned homes to perform autopsies without any oversight from them, that argument is also contradicted by the record. The Coroner is authorized by law to command where autopsies occur. Dr. McGarry was a contractor who worked for the County, and he had an agreement with the County. Moreover, the County paid Dr. McGarry for each autopsy, after his invoices were submitted and approved by the Coroner. *See supra* at 17-19. Defendants point to nothing, except for the Coroner's own say-so, to suggest that Dr. McGarry was calling the shots. Notably, it is difficult to even assess the credibility of the Coroner's testimony on this point, given that Dr. McGarry has died. Regardless, it is important to note that the Coroner testified that he never even attempted to tell Dr. McGarry to rotate autopsies among the funeral homes of Harrison County and never told Dr. McGarry that he had the option of using Plaintiffs' facilities. *See id.*

Finally, the statistical evidence demonstrates conclusively that Defendants' claimed need to conduct autopsies at particular facilities cannot explain the disparate treatment of Plaintiffs that is apparent in the Coroner files. *See id.* All of these disputes of fact mean that a jury must

determine whether Defendants' autopsy and refrigeration excuses are pretexts.

### 2. Defendants' "Statistical" Arguments Lack Merit

Defendants also engage in a limited discussion of the Mississippi state statistics and Coroner files discussed above. Only Defendants focus narrowly on numbers for just two funeral homes (Riemann and Marshall) in a single year (2015). *See* MSJ at 14-15, 22.

For starters, to the extent that Defendants present their own interpretation of the data (an interpretation that, to be sure, is not contained in any expert report), they have at best identified a factual dispute for trial, not a reason they are entitled to judgment based on undisputed facts. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012); *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prod. Liab. Litig.*, 2014 WL 3557345, at *12 (N.D. Tex. July 18, 2014). Along the same lines, Defendants' limited focus on statistics for one year relating to two funeral homes ignores the majority of Plaintiffs' statistical evidence and all of the other data discussed above. Cherry picking statistics and presenting them as undisputed facts does not warrant summary judgment. *See*, *e.g.*, *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6075566, at *4 (W.D. Tex. Apr. 22, 2016) (denying summary judgment where expert "ignore[d] relevant evidence by cherry-picking the facts which conform to a desired outcome.").

Moreover, Defendants' argument is plagued by analytical errors. For example, they note that the Marshalls' funeral business consists of between 23% and 32% white decedents, and then announce that "[t]hese statistics defy the argument of racial discrimination in the removal of bodies." MSJ at 14. But it is not clear at all how that is the case, and Defendants do not explain it. The fact that a quarter to a third of the business conducted by one of the six Plaintiffs pertains to white decedents does not demonstrate that Defendants are directing business equally to the funeral homes in Harrison County. Indeed, the numbers cited by Defendants here are expressed

*as a percentage of the Marshalls' own business.* Knowing that a given percentage of the Marshalls' total cases are white decedents does not tell us whether the Marshalls are receiving cases (white, black, or other) from the Coroner at the same frequency as other homes. In fact, it does not tell us what is happening with other homes or how the homes compare with one another at all. It would be more informative to compare Defendants' cited numbers of white decedents handled by the Marshalls in 2015 to the total number of white decedents in Harrison County that year, which reveals that the Marshalls received just 5% of white decedents (59 of 1,123).

Consider also that the statistics cited by Defendants, properly analyzed, actually undermine Defendants' own position. On page 14 of their brief, Defendants state that the Coroner performed 1,349 death investigations in 2015, that Riemann was selected for 433 of those cases, and that Marshall was selected for 69. So Riemann received 32% of the cases that year from the Coroner, and the Marshalls received 5%. That represents a gross disparity of treatment, even accepting Defendants' numbers wholesale.

Finally, Defendants' argument that statistics statewide in Mississippi support their position is logically flawed. According to Defendants, the fact that other Mississippi counties also report racial disparities in the assignment of cases to funeral homes means that they have not engaged in race discrimination. Put another way, Defendants contend that because the numbers in Harrison County (again, in a cherry-picked time frame for two funeral homes) reflect slightly less disparity than other Mississippi counties, they cannot have engaged in race discrimination.

The premise of these arguments is false. Defendants contend that because there is disparity in all counties, it cannot be a product of race discrimination. On the contrary, the statistics that Defendants cite show that race discrimination in the funeral business is widespread in Mississippi. However, Defendants' arguments on this point are not based on any evidence in

the record about what is actually happening in other Mississippi counties, apart from the statistics cited. And so neither the Court nor the parties need take on the larger issue of racial discrimination in this industry statewide. Defendants' statistical arguments fail to demonstrate that undisputed facts entitle them to summary judgment.

### D. The Coroner Is Not Entitled to Qualified Immunity

Defendants assert that the Coroner is entitled to summary judgment due to qualified immunity. MSJ at 23. In this fatally undeveloped argument, Defendants fail to cite or even discuss the applicable test—(1) whether Hargrove violated Plaintiffs' constitutional rights, and (2) whether the right at issue was clearly established at the time of his conduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As discussed, factual disputes preclude summary judgment on the question of whether the Coroner violated Plaintiffs' constitutional rights. Moreover, there the law is clearly established: "There is no qualified immunity for racial discrimination as such discrimination is clearly unconstitutional." *Hampton Co. Nat'l Sur., LLC v. Tunica Cnty., Mississippi*, 543 F.3d 221, 229 (5th Cir. 2008). Qualified immunity is unavailable.

### V. A JURY MUST DECIDE THE CLAIMS UNDER § 1981

In a sentence, Defendants assert that Plaintiffs cannot pursue a claim under § 1981 because they have not shown the existence of a contract. MSJ at 23. For the reasons stated above, this undeveloped argument does not shift the summary judgment burden. *See supra* at 24-26.

The argument also lacks merit. Plaintiffs allegations—that Defendants deliberately prevented them from engaging in the business of providing funeral services on account of their race—plainly fall within the language of the statute, which is far broader than Defendants acknowledge. *See* 42 U.S.C. § 1981(b) ("[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship.").

The Supreme Court has explained that § 1981 "was 'meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.'" *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003). As a consequence, "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981." *Id.* (citing G*eneral Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 389-390 (1982)). Accordingly, the arguments discussed already, which preclude summary judgment on Plaintiffs' equal protection, Title VI, and Mississippi constitution claims, also preclude judgment on Plaintiffs' § 1981 claims.

Unlike the Equal Protection Clause or Title VI, however, a showing of discriminatory purpose is not necessary under § 1981 (though it is sufficient). In this way, § 1981 is broader than the Equal Protection Clause and Plaintiffs are entitled to a trial so long as they demonstrate "disparate impact discrimination" utilizing the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir.1996) ; *Johnson v. Manpower Prof'l Servs., Inc.*, 442 F. App'x 977, 981 (5th Cir. 2011). Under that framework, Plaintiffs must present a *prima facie* case of discrimination at this stage; Defendants must rebut that *prima facie* case with record evidence that race-neutral bases justify the disparate treatment of black-owned funeral homes; and Plaintiff must then submit evidence that would allow a reasonable jury to conclude that the purported race-neutral reasons are pretexts. *McDonnell Douglas*, 411 U.S. at 802.

Here, Plaintiffs have made their *prima facie* case—indeed it is undisputed that the extreme majority of Coroner's cases go to the two white-owned funeral homes in Harrison County. Again, the Coroner presents two race-neutral explanations for the disparity: (1) that

Plaintiffs' purported lack of refrigeration; and (2) that the need to conduct autopsies at white-owned funeral homes. As discussed above, the evidence strongly supports that Defendants' race-neutral justifications are pretexts. *See supra* at 15-19. Plaintiffs' § 1981 claims are fact-laden; and disputes of fact in the record preclude summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001) (summary judgment on a discrimination claim inappropriate where factual disputes existed as to pretext); *Evans v. City of Bishop*, 238 F.3d 586, 592 (5th Cir. 2000) ("The Supreme Court in *Reeves* emphasized the importance of jury fact finding and reiterated that evidence of the *prima facie* case plus pretext may, and usually does, establish sufficient evidence for a jury to find discrimination.") (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S. Ct. 2097, 2109 (2000)). A jury should decide this claim, too.

## VI.    MTCA IMMUNITY DOES NOT APPLY

The Mississippi Tort Claims Act ("MTCA") creates a limited immunity for state-law claims where a governmental entity or its employees act within the scope of their employment. Bearing in mind that their arguments are again woefully underdeveloped, Defendants appear to invoke two provisions of the MTCA: (1) "good faith" immunity and (2) "discretionary function" immunity. MSJ at 23. Neither of these are a basis for granting summary judgment here.

First, as to good faith, entities and employees are immune from claims "[a]rising out of any act or omission of an employee of a governmental entity exercising ordinary care in reliance upon, or in the execution or performance of, or in the failure to execute or perform, a statute, ordinance or regulation, whether or not the statute, ordinance or regulation be valid." MISS. CODE. ANN. § 11-46-9(b). The problem with the invocation of this provision is that the disputed issues of fact discussed above preclude a conclusion that Defendants were "exercising ordinary care" in performing their functions. On the contrary, they were discriminating against black-

owned funeral homes in Harrison County. Defendants cannot claim that they were acting in "good faith reliance" on a statute that required them not to prefer one particular funeral home over others when record evidence illustrates that they have, in fact, preferred certain funeral homes, and have done so on account of race. *See Dixon ex rel. Dixon v. Alcorn Cty. Sch. Dist.*, 2012 WL 273079, at *4 (N.D. Miss. Jan. 30, 2012) (denying MTCA immunity at summary judgment because genuine disputes of material fact precluded a finding of "ordinary care").

Second, for discretionary immunity, the MTCA immunizes governments and employees from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused." MISS. CODE. ANN. § 11-46-9(d). This provision "requires [courts] to look at the *function* performed—not the *acts* that are committed in furtherance of that function—to determine whether immunity exists. *Little v. Mississippi Dep't of Transp.*, 129 So. 3d 132, 136 (Miss. 2013). If the function is ministerial, rather than discretionary, there is no immunity for acts performed in furtherance of the function, and a "ministerial function is one that is positively imposed by law." *Id.*; *see also Pratt*, 97 So.3d at 72 (¶ 9).

Without citation or discussion, Defendants assert that there is "no dispute Hargrove was performing a clearly discretionary function." MSJ at 23. Not so. The parties dispute whether the functions of the Coroner were "discretionary" or "ministerial." Defendants' failure to develop their argument is particularly problematic given that the Mississippi Supreme Court recently "overhauled its analysis of discretionary function immunity," and the Court's treatment of this immunity has "changed drastically" since 2010. *Boroujerdi v. City of Starkville*, 158 So. 3d 1106, 1108, 1111 (Miss. 2015) (citing *Brantley v. City of Horn Lake*, 152 So.3d 1106 (Miss. 2014)). A big part of that change was *Little v. Mississippi Department of Transportation*, in

which the state Supreme Court abandoned its former "public-policy" test and instead emphasized that, consistent with the statutory language, "it is the function being fulfilled, rather than the act performed in furtherance of that function, to which discretionary-function immunity does or does not attach." *Brantley*, 152 So.3d 1106, 1112, ¶20. Accordingly, the Court has emphasized that "all acts in furtherance of a ministerial function lack immunity notwithstanding that the act itself may involve an element of discretion." *Id.* at 1116, ¶33.

In this case, state statutes provide that for deaths "affecting the public interest" the Coroner exercises jurisdiction and must take particular actions—this is the function performed by coroners across the state. *See* Miss. Code. Ann. § 41-61-53 (defining terms); *id.* § 41-61-59 (certain procedures "shall" be followed for a death that affects public interest). Nearly every section of the Act outlining the functions that a coroner (as county medical examiner) performs uses mandatory terms.[21] Moreover, and particularly relevant to this case, Defendants themselves emphasize that the statute mandates that a coroner "*shall not* use his position of authority to favor any particular funeral home or funeral homes." *Id.* § 41-61-63 (emphasis added).

Given the foregoing, the function of the Coroner is plainly ministerial. There is no support for the view that his function is discretionary. Of course, particular acts that any official performs always involve some degree of discretion, but the function of the Coroner's office is ministerial, and it is the function and not the acts of the Coroner on a day-to-day basis that matters for purposes of MTCA immunity. Accordingly, MTCA immunity does not apply here.

---

[21] The statute provides that there "shall be" at least one county medical examiner, *id.* § 41-61-57(3), who "shall" meet training and certification requirements, *id.*; upon "the death of any person where that death affects the public interest" the coroner "shall" be notified and "shall" notify the state, *id.* § 41-61-61(a); no person "shall disturb the body at the scene" of a death affecting public interest until authorized by the medical examiner, *id.*; upon approval of the coroner, "if an autopsy is to be performed the body shall be transported directly to an autopsy facility, *id.* § 41-61-61(4). The law governing the manner in which the coroner must fill out death certificates also uses mandatory language. *Id.* § 41-61-63.

## VII.      A JURY MUST DECIDE THE CLAIMS UNDER MISS. CODE § 41-61-63

Defendants' only argument concerning Count VI, which alleges a violation of the state law that prohibits the Coroner from using his position or authority to favor any particular funeral home, is that the claim is "without merit" because the Coroner has "no authority in the absence of a required autopsy to disregard a family member's preference as to funeral home of choice." MSJ at 24. As explained above, the question of what happens in cases where the family dictates the choice of a funeral home is irrelevant to this case. This case is about situations where the Coroner exercises his authority to determine what funeral home is selected. The record shows an overwhelming preference on the Coroner's part for the two white-owned funeral homes in Harrison County. Indeed, even the Coroner's own expert agrees that any claim that the Coroner distributes county business evenly, by using a rotation system, is contradicted by the data. Defendants have not and cannot meet the burden of showing that there is no genuine issue of fact on the question whether the Coroner has favored white-owned funeral homes over Plaintiffs.

## VIII.      A JURY MUST DECIDE THE CLAIMS OF IMPLIED BREACH OF CONTRACT AND FRAUD IN THE INDUCEMENT

Plaintiffs' implied breach of contract and fraud in the inducement claims relate to the fact that the Coroner falsely claimed that he used a rotation system in determining where to direct funeral home services, which induced them to participate in the public market for funeral home services on unequal footing, causing them actual damages. Indeed, the record bears out that Hargrove did not—and has never—used a rotation system.

Defendants' arguments about these claims are so cursory that they cannot reasonably be considered sufficient to satisfy Defendants' initial burden at summary judgment. For the implied breach of contract Defendants assert that the claim "cannot survive the statutory immunity defense." MSJ at 24. But they have not identified an immunity provision under the MTCA that

they think applies, which is fatal. If they are referring to the "good faith" or "discretionary" function" immunities discussed above, those arguments fail for the reasons identified already. Defendants cite in passing to a "legislative intent" section of the MTCA, but that provision does not control, given that the MTCA is a general waiver of immunity subject to the exceptions explicitly defined in the statute. *See* MISS. CODE. ANN. § 11-46-9. Defendants fail to identify any basis for immunity from Plaintiffs' implied breach of contract claim, and they cannot do so for the first time in reply. Moreover, Defendants do not point to any record evidence in their brief that touches on the subject of whether or not an express or implied contract existed.

Defendants' argument concerning fraud in the inducement fares no better. Defendants' only argue that there was "no existing contract." MSJ at 24 (citing *Lacy v. Morrison*, 906 So.2d 126, 129 (Miss. 2004)). But the authority cited by Defendants undermines their argument. *Lacy* emphasizes that a fraudulent inducement claim is a quintessential "fact based question," and is therefore "generally . . . inappropriate for disposition at the summary judgment stage." *Id.* The elements of the claim are: (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the matter reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) his consequent and proximate injury. *Id.* (citation omitted). Construing the facts in Plaintiffs' favor, all of these elements are met.

As set out above, the record supports that Plaintiffs were told by the Coroner that he used a rotation system. That claim was false. It was material in that induced Plaintiffs to think they were competing on equal footing for the business controlled by the Coroner. There is a dispute of fact about whether the Coroner knew that the claim was false. Ample evidence supports that the Coroner intended for Plaintiffs to rely upon that information—the false statements were designed

to ensure that Plaintiffs continued to work on unequal footing without knowledge of the Coroner's discrimination. Plaintiffs have testified that they did not know the Coroner was not truthful with them. Finally, Plaintiffs relied upon that information, suffering damages as a result of the Coroner's promised rotation system for years. *See supra* at 14-15. This is all that is required to state a claim, and Defendants motion on this claim should be denied as well.

## IX.  A JURY MUST DECIDE THE CONSPIRACY CLAIMS

Plaintiffs allege that the Coroner and the Board (a public body made up of individuals) agreed to violate Plaintiffs' rights. Defendants' description of the law of conspiracy seems to suggest (though Defendants never say so directly) that there cannot be a conspiracy claim here because the Coroner is the only individually named defendant and the remaining Defendants are governmental entities. To the extent Defendants are making that argument, it fails—entities can be part of civil conspiracies. *Gallagher Bassett Services, Inc . v. Jeffcoat*, 887 So.2d 777, 786 (Miss. 2004) (noting that a civil conspiracy can come from a finding that "two or more persons *or corporations*" entered into an agreement to commit unlawful acts) (emphasis added). Turning to the argument that Defendants do make explicitly, Defendants again fail to observe the summary judgment standard, which requires them to accept Plaintiffs' facts. Instead, they assert that there has been no "unlawful purpose" shared by the Coroner and the Board. However, because discriminating against Plaintiffs on the basis of race and using their authority to favor particular funeral homes over others is unlawful, Defendants' argument fails.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that this Court deny Defendants' motion for summary judgment in its entirety.

**DATE: November 13, 2017**

RESPECTFULLY SUBMITTED,

**THEODORE WILLIAMS,** *et al.*

By:  /s/ Steven Art
     *One of Plaintiff's Attorneys*

*Attorneys for Plaintiffs*

| | | |
|---|---|---|
| Michael Kanovitz* | Robert McDuff | Beth L. Orlansky |
| Steven Art* | 767 N. Congress St. | Kiara A. Taite |
| David B. Owens* | Jackson, MS 39202 | Mississippi Center for |
| Katherine A. Roche* | (601) 969-0802 | Justice |
| LOEVY & LOEVY | rbm@mcdufflaw.com | 963 Division St. |
| 311 N. Aberdeen St., 3rd fl. | | Biloxi, MS 39530 |
| Chicago, IL 60647 | | (228) 435-7248 |
| (312) 243-5900 | | borlansky@mscenter |
| (312) 243-5902 (fax) | | forjustice.org |
| steve@loevy.com | | |
| * Admitted *pro hac vice* | | |

**CERTIFICATE OF SERVICE**

I, Steven Art, an attorney, hereby certify that on November 13, 2017, I filed the foregoing

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**

**SUMMARY JUDGMENT** using the Court's CM/ECF system, which effected service on all

counsel of record.

By:     /s/ Steven Art
        *One of Plaintiff's Attorneys*

THEODORE WILLIAMS, *et al.*,           )
                                       )      Case No. 1:16-cv-00266-KS-MTP
          Plaintiffs,                  )
                                       )      Hon. Keith Starrett
     v.                                )      District Judge
                                       )
GARY HARGROVE, *et al.*,               )      Hon. Michael T. Parker
                                       )      Magistrate Judge
          Defendants.                  )
                                       )      JURY TRIAL DEMANDED

## EXHIBITS TO PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| No. | Description |
|-----|-------------|
| 1 | Plaintiffs' Responses to Harrison County's Interrogatories |
| 2 | Deposition of Eddie Hartwell (excerpts) |
| 3 | Deposition of Theodore Williams (excerpts) |
| 4 | Deposition of Ricky August (excerpts) |
| 5 | Deposition of Anthony Marshall (excerpts) |
| 6 | Funeral Home Licenses |
| 7 | Declaration of Sonya Williams Barnes |
| 8 | Deposition of Lasha August (excerpts) |
| 9 | Deposition of Gina Marshall (excerpts) |
| 10 | Deposition of Helen Evans (excerpts) |
| 11 | Deposition of Coroner Gary Hargrove |
| 12 | Deposition of Brian Switzer (excerpts) |
| 13 | Deposition of Charles Wise (excerpts) |
| 14 | Coroner Hargrove's Responses to Plaintiffs' First Interrogatories |
| 15 | County Responses to Plaintiffs' First Interrogatories |
| 16 | Plaintiffs' Supplemental Responses to Harrison County's Interrogatories |

| No. | Description |
|-----|-------------|
| 17 | Roster of Board Members |
| 18 | Overview of State Funeral Home Death Statistics |
| 19 | State Funeral Home Death Statistics 2007 |
| 20 | State Funeral Home Death Statistics 2008 |
| 21 | State Funeral Home Death Statistics 2009 |
| 22 | State Funeral Home Death Statistics 2010 |
| 23 | State Funeral Home Death Statistics 2011 |
| 24 | State Funeral Home Death Statistics 2012 |
| 25 | State Funeral Home Death Statistics 2013 |
| 26 | State Funeral Home Death Statistics 2014 |
| 27 | State Funeral Home Death Statistics 2015 |
| 28 | State Funeral Home Death Statistics 2016 (First Six Months) |
| 29 | Example Death Investigation Form with Confidential Information Redacted |
| 30 | Coroner File Dataset |
| 31 | Declaration of Dr. Campbell |
| 32 | Exhibit A to Declaration of Dr. Campbell – Report |
| 33 | Exhibit B to Declaration of Dr. Campbell – Supplemental Report |
| 34 | Exhibit C to Declaration of Dr. Campbell – Rebuttal Report |
| 35 | Exhibit D to Declaration of Dr. Campbell – Dr. Campbell CV |
| 36 | Exhibit E to Declaration of Dr. Campbell – Index of Coroner Files |
| 37 | Declaration of John Gale, Ph.D. |
| 38 | Exhibit A to Declaration of John Gale, Ph.D. – Report |
| 39 | Exhibit B to Declaration of John Gale, Ph.D. – Supplemental Report |
| 40 | Exhibit C to Declaration of John Gale, Ph.D. – John Gale CV |
| 41 | Deposition of President Connie Rockco (excerpts) |
| 42 | Deposition of John Johnson (excerpts) |
| 43 | Deposition of Dr. Palmer (excerpts) |
| 44 | Deposition of Joy Yates (excerpts) |

| No. | Description |
|-----|-------------|
| 45 | Coroner File Dataset, Subset of Files With No Indication of Family/Decedent Choice |
| 46 | Coroner File Dataset, Subset of Files from Hospitals, Nursing Homes, Hospice, Sole Evidence of Coroner Selection |
| 47 | Declaration of Anne Gottschalk |
| 48 | Coroner Responses to Plaintiffs' Second Interrogatories |
| 49 | County Responses to Plaintiffs' Second Interrogatories |
| 50 | Deposition of Beth Seymour |
| 51 | County Payment Records |