IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**THEODORE WILLIAMS et al.**                                                          **PLAINTIFFS**

**v.**                                                          **CIVIL ACTION NO. 1:16-CV-266-KS-MTP**

**GARY HARGROVE et al.**                                                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion to Exclude the Proposed Expert Testimony of Richard T. Campbell ("Motion to Exclude)[141] filed by Defendants Gary Hargrove, the Harrison County Board of Supervisors, and Harrison County, Mississippi. After considering the submissions of the parties, the record, and the applicable law, the Court finds that this motion is well taken and should be granted.

## I. BACKGROUND

Plaintiffs Theodore Williams, Lockett Williams Mortuary, Inc., Ricky August, Lasha August, Jonathan August, Richmond-August Funeral Home, Inc., Eddie Hartwell, Hartwell & Family Funeral Home, LLC, Anthony Marshall, Gina Marshall, Marshall Funeral Home, Pamela Dickey, Dickey Brothers Memorial Funeral Home, LLC, Helen Evans, and J.T. Hall Funeral Home, Inc. (collectively "Plaintiffs") are a group of funeral homes and their owners, all of whom are black and located in Harrison County. On July 18, 2016, Plaintiffs brought this action against Defendants Gary Hargrove ("Hargrove"), Harrison County Board of Supervisors (the "Board"), and Harrison County, Mississippi (the "County") (collectively "Defendants"), alleging that Defendants discriminated against them by favoring the services of white-owned funeral homes over them. They bring federal claims under Title VI and 42 U.S.C. §§ 1981 and 1983, as well as multiple state law claims.

Defendants filed their Motion to Exclude [141] challenging Dr. Richard T. Campbell ("Dr. Campbell") on October 16, 2017. Dr. Campbell's expert opinion is based on a statistical analysis of several spreadsheets provided to him by Plaintiffs' counsel.

Once briefing was complete on the Motion to Exclude [141], the Court ordered a hearing as to the admissibility of Dr. Campbell's expert testimony. (*See* Order [188].)[1] That hearing was held on February 7, 2018, and parties were given until February 14, 2018, to file supplemental briefing. After considering the arguments and evidence offered at the hearing and in the briefing, the Court is now ready to make its ruling.

## II. DISCUSSION

A.  **Standard of Review**

The motion before the Court challenge the admissibility of expert testimony and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993).

The admissibility of expert testimony is governed by F.R.E. 702, which states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)  the testimony is based on sufficient facts or data;

(c)  the testimony is the product of reliable principles and methods; and

(d)  the expert has reliably applied the principles and methods to the facts of the case.

---

[1] In that same order, the Court denied the motion as to Plaintiffs' other expert, Dr. John M. Gale, as Defendants did not give any specific arguments with respect to him.

The Supreme Court has explained that this rule places the district court into a gatekeeping role in order to ensure that scientific evidence is both reliable and relevant. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 597, 113 S. Ct. 2786). As explained by the Fifth Circuit,

> This role requires the district judge to undertake a two-part analysis. The district judge must first determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid. Second, the district judge must determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant.

*Id.* (citing *Daubert*, 509 U.S. at 592-93, 113 S. Ct. 2786).

**B.      F.R.E. 702**

In evaluating Dr. Campbell's proposed expert opinions, the Court does not believe that they meet even the baseline requirements of F.R.E. 702. This was clear from the onset of Dr. Campbell's testimony at the hearing held on February 7. Near the beginning of his testimony, Dr. Campbell claimed that he performed his analysis on those cases where Hargrove either did or *may have* had control over which funeral home was utilized. He also admitted that there were around 3000 cases, out of the nearly 6000 total cases,[2] where there was no indication as to who made the decision.[3] He further stated that he made the decision to analyze all of these "ambiguous" cases as if the decision was made by Hargrove, and also admitted that his analysis was based on a hypothetical. Based on the admittedly speculative nature of his analysis, the Court does not see how it could be helpful to the jury as required by F.R.E. 702(a). *See Moore v. Ashland Chem. Inc.*,

---

[2] The Court assumes that the decedent or a family member/friend made the funeral home decision for the majority of the remaining cases.

[3] This lack of indication is understandable considering, as Dr. Campbell stated at the hearing, that around 87 percent of the cases were natural deaths whose files were short and did not contain extensive information.

3

151 F.3d 269, 279 (5th Cir. 1998) ("Under the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity.").

In fact, on multiple occasions during his testimony at the hearing, Dr. Campbell stressed that, despite his opinion excluding the possibility that Hargrove fairly used a race-blind rotational system when he decided which funeral home to use, this opinion was based on an analysis of cases where there was a *possibility* that Hargrove made the decision because the data given to him did not indicate otherwise. He further conceded that there was an equal possibility that someone else made the decision in those cases. Based on the inconsistency of this analysis, where all or none of the cases analyzed may have been controlled by Hargrove, and the opinion, which affirmatively states that Hargrove's decisions were based on race, the Court does not see how Dr. Campbell's testimony could do anything but confuse and mislead the jury.

The Court also does not find that Dr. Campbell based his opinions on sufficient facts and data as required by F.R.E. 702(b). *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354 (5th Cir. 2007) ("[U]nder *Daubert* and Fed. R. Evid. 702, a district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion."). During the hearing, it became clear to the Court that Dr. Campbell's opinions were based solely on the spreadsheets given to him by Plaintiffs' counsel. Despite listing in his report that he reviewed the coroner's files from 2012 through 2016, he admitted that he relied on the data from the spreadsheets instead of the files themselves and that he only examined files from the years 2012 and, possibly, 2013.[4] These spreadsheets[5] are a compiled analysis of the Coroner's files done

---

[4] Dr. Campbell's assertion concerning which files he examined has changed many times between the time of his first report and the time of the hearing.
[5] The inadmissibility of these spreadsheets is not at issue in this motion, though the Court cannot fathom how Plaintiffs' counsel could seek to introduce them without impermissibly injecting themselves and their law firm into the lawsuit and violating the rules of professional conduct. *See United States v. Solvay*, Civil Action H-06-2662, 2016 WL 1258401, at *13 (S.D. Tex. March 31, 2016) ("[E]ven if the underlying data were admissible, the summary charts are

4

by the law firm of Plaintiffs' counsel and, during the hearing, were demonstrated to be inaccurate in many instances.[6] Though Plaintiffs' counsel during the hearing attempted to gloss over these errors by having Dr. Campbell acknowledge that occasional errors are assumed in datasets this large, the numerous and blatant errors[7] in the spreadsheets demonstrated to the Court at the hearing do not speak to inadvertent human errors in coding, but biased and deliberate coding meant to lend itself to an analysis favorable to Plaintiffs.

Additionally, Dr. Campbell admitted at the hearing that he chose which cases to include in his analysis based on assumptions that he, when questioned, could not justify. He testified that, of the seven variables he used to determine the cases to include, two were whether it involved an indigent case and whether there was an autopsy. When pressed, he stated that he assumed the coroner made the decision in indigent cases but that he could not say why he made that assumption. He further admitted that he knew that the pathologist, an independent contractor, made the decision in autopsy cases but considered that variable regardless.[8] With Dr. Campbell's analysis based on a biased and inaccurate dataset and on unjustified assumptions, the Court cannot find that his opinion testimony is based on sufficient facts and data.

Finally, the Court does not find that Dr. Campbell's application of the methods used in his analysis were reliably applied in this case as required by F.R.E. 702(d). First, by Dr. Campbell's

---

not admissible because they were apparently prepared by Relators' lead counsel, who cannot serve as the proponent of the charts at trial.").

[6] One glaring example that the Court notes is in case 12-0136, which was coded as a case where Hargrove may have made the funeral home decision even though the file included a release of body form signed by the spouse that, despite a scanning error, clearly meant that Hargrove did not and could not have made the decision.

[7] In many instances, the case files reflected that a family member was with the decedent when they passed, in which cases Hargrove would not, by statute, have any authority to direct the body to one funeral home over another. Also, many cases involved individuals who had been under hospice care, and Hargrove's unrefuted testimony states that he never made decisions in hospice cases. Despite this, many of these cases were coded as instances where Hargrove could have made a decision.

[8] Whether or not the pathologist actually made the decision in autopsy cases is an issue that is in contention, but Dr. Campbell's belief that he did, as evinced by his testimony at the hearing, is troubling because, despite this belief, he included autopsy cases when he presumably knew Hargrove did not make the funeral home decision.

5

own explanation of the chi-square of independence test, the test was meant to determine whether race and funeral home were independent variables for all of the Coroner's files. There is no dispute, though, that race and funeral home were *not* independent of each other. The operable question is whether the correlation between race and funeral home was the result of impermissible racial discrimination on Hargrove's part or the result of self-selection by the decedents or their families and friends. Second, the chi-square test for fitness, on which Dr. Campbell bases his opinion that no rotational system was used and therefore Hargrove must have based his decisions on race, is meaningless when performed on an array of cases where Hargrove may not have made any decision. In applying this test, Dr. Campbell posits hypothetical situations in which Hargrove made the funeral home decision in 10, 5, or 3 percent of the "entire population of 5326[9] for whom we have complete data." (Campbell Report [141-1] at p. 18.) Dr. Campbell testified that he based these percentages on the guess of Hargrove, who at his deposition stated that about 95 percent of the time, the decision was not made by him. Applying this test to admitted hypothetical situations whose only basis in fact is a speculation made by Hargrove is not a reliable application of this test to the facts in this case as required by F.R.E. 702(d).

Based on the record before it, the Court does not believe that Plaintiffs have demonstrated that Dr. Campbell's expert testimony is admissible under F.R.E. 702. However, even if it were, it does not survive the Court's deeper analysis of reliability under *Daubert*.

### C. Reliability under *Daubert*

Under a *Daubert* analysis, expert testimony must be both reliable and relevant. *Curtis*, 174 F.3d at 668 (citing *Daubert*, 509 U.S. at 592-93, 113 S. Ct. 2786). The Court does not find that Dr. Campbell's opinion testimony is reliable.

---

[9] The total cases are 5821, but this analysis omits those sent to funeral homes outside of the County.

For expert testimony to be reliable, it "must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." *Curtis*, 174 F.3d at 669. Importantly, it is the party seeking to have the expert admitted who bears the burden of demonstrating "that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable." *Id.* at 668. "[A]ny step that renders the analysis . . . renders the expert's testimony inadmissible." *Id*. at 670 (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 n.10 (5th Cir 1998) (en banc)) (emphasis omitted). "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). Once the Court has considered the *Daubert* factors,[10] the Fifth Circuit allows it to "consider whether other factors . . . are relevant to the case at hand." *Id.* (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999)). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight*, 482 F.3d 355 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

Taking Dr. Campbell's analysis and conclusions together as a whole, the Court cannot find that they are reliable. First, the facts Dr. Campbell bases his analysis on are spreadsheets prepared by Plaintiffs' counsel and/or their law firm and have been demonstrated to be biased and inaccurate. *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (holding that an expert's reliance on "the plaintiffs' compilations of data . . . gives rise to a 'common-sense skepticism' regarding the expert's evaluation"); *see also McElroy v. Evanston Ins. Co.*, No. 3:14-CV-180-CWR-FKB,

---

[10] The *Daubert* factors themselves go more towards the method itself than to its application to the facts of any given case. *See Paz*, 555 F.3d at 388 (listing the *Daubert* factors). The statistical methods themselves have not been challenged by Defendants, nor does the Court find any reason to doubt that they are sound statistical methods. Instead, the focus of the Motion to Exclude [141] is whether the spreadsheets and underlying factual assumptions made by Dr. Campbell can properly be the basis of a reliable expert opinion.

7

2016 WL 2726859, at *4 (S.D. Miss. May 6, 2016) (holding that relying on a factual foundation that was unreliable, even if the expert did not know it was unreliable, rendered the opinion unreliable).

Second, Dr. Campbell's analysis is based on unjustified assumptions and speculations as to the cases where Hargrove had any authority to direct a body to one funeral home or another. *See Moore*, 151 F.3d at 279 ("Under the *Daubert* regime, trial courts are encouraged to exclude such speculative testimony as lacking any scientific validity.").

Third, the conclusions Dr. Campbell asserts do not align with the analyses performed. Dr. Campbell concludes that a rotational system could not have been used and that, instead, the analysis shows that the distribution was based on race. However, with the data relied upon by Dr. Campbell is not sufficiently linked to this conclusion. While the Court understands that Dr. Campbell's conclusion is based on a relatively simple percentage distribution, with each funeral home expected to get an X number of cases if Hargrove made the decision in Y percentage of cases, there is no factual basis for concluding that Hargrove made a decision in any given Y percentage of cases. Dr. Campbell himself admitted that the percentages used were all hypotheticals and based on the guess Hargrove, who is not a statistician, made in his deposition. Even the smallest percent analyzed by Dr. Campbell would have Hargrove making the decision in 160 cases. (*See* Campbell Report [141-1] at 18.) There is no evidence, however, to show that Hargrove actually made the decision in 160 cases, and the Court does not find that an opinion based on hypotheticals to be reliable under a *Daubert* analysis.

Finally, because Dr. Campbell only purports to exclude a rotational system and makes no reference to the other race-neutral explanations given by Defendants throughout the lawsuit, the

Court does not find that his exclusion of such a system would support his conclusion that race played a role in Hargrove's decisions.

Therefore, for the foregoing reasons, the Court finds that the Motion to Exclude [141] should be **granted**. Dr. Campbell will be precluded from testifying as an expert witness in this case.

### III.  CONCLUSION

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion to Excluded [141] is **granted**.

SO ORDERED AND ADJUDGED, on this, the 27th day of February, 2018.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE